## In re INQUIRY CONCERNING A JUDGE.

No. S–3187.

Supreme Court of Alaska.

March 9, 1990.

---

George N. Hayes and Jill E. Mickelsen, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, for appellant.

Arden E. Page, Burr, Pease & Kurtz, Anchorage, for appellee.

Before MATTHEWS, C.J., and BURKE and COMPTON, JJ.

OPINION

COMPTON, Justice.

This is the second time this case has been before the court. *See In re Inquiry Concerning a Judge*, 762 P.2d 1292 (Alaska

1988) (*Judge I*). After holding that the Alaska Commission on Judicial Conduct (Commission) has no constitutional authority to publicly reprimand a judge, *Judge I*, 762 P.2d at 1296, we remanded the matter to the Commission for recommendation of an appropriate sanction. *Id.* We did not address the merits of the Commission's findings and conclusions at that time. The Commission now has recommended public censure. We reject the recommendation and impose the sanction of private reprimand.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Appellant[1] is a retired vice-president of a defunct airline named Kodiak Western Alaska Airlines, Inc. (KWA). KWA carried persons, freight and mail from approximately forty bush communities to Kodiak, King Salmon and Dillingham. If a person wanted to travel to Anchorage or anywhere else other than the three mentioned communities, the person had to connect with another airline, usually Wien Alaska Airlines (Wien).

Gifford Aviation Air (Gifford) owned most of KWA's stock. Gifford, an on-call charter air taxi, flew cargo delivery airplanes.

Appellant began his private career as counsel for a consortium of oil companies called the SAM group, standing for Shell, ARCO and Mobil. Part of SAM's off-shore development project involved designing helicopters to explore the Gulf of Alaska. After three years, Appellant practiced law on his own, primarily in aviation. He then became counsel to Wien, a scheduled passenger and cargo carrier at that time, negotiating and granting small bush carriers' reduced rate agreements and other contracts. He left Wien in 1982, after about three years of employment, and started to work for KWA. He negotiated with

KWA's board of directors to receive travel benefits immediately upon employment.

Part of Appellant's duties included contracting reduced fare agreements with other airlines. A typical reduced fare agreement gives an airline authority to issue a ticket on another airline at a price less than the published fares. Some airlines declined to enter such an agreement with KWA, while others agreed.[2]

An interline agreement, or baggage and ticket agreement, allows airlines to ticket passengers and transfer baggage on one another's routes. KWA was not interested in interlining, being a small airline only providing service from three western Alaska communities to the bush. Furthermore, KWA lacked the computer reservation capability and personnel required to interline.

On July 8, 1982, Appellant contacted Pacific Southwest Airlines about the possibility of entering into a reduced fare agreement, but was notified that PSA was unwilling to extend travel benefits to unscheduled airlines. On April 1, 1983, he inquired again. In response, Mary Anne Galetto, PSA's vice-president of Pricing and Economic Planning, verified that KWA was now a scheduled airline, and offered to enter a reduced fare agreement if KWA would also enter into an interline agreement. Her letter stated:

> Our current policy restricts employee travel benefits to employees of airlines with which we interline revenue passengers.

She sent both a reduced fare contract form and an interline contract form to Appellant.

The PSA reduced fare agreement gave each airline authority to self-ticket, or issue reduced fare tickets on its own ticket stock, on a space available basis, to its employees rather than have them obtain the tickets each time from the carrying airline. Blank ticket stock and a validating stamp are used to create such a ticket.

---

1. This court has ordered that the identity of the judge not be disclosed. Therefore, the judge is referred to throughout this opinion as the "Appellant."

2. KWA entered into reduced fare agreements, without an accompanying interline agreement, with the following airlines: Alaska, Aloha, Hawaiian, Pacific Western, Republic, Southwest Pacific Island, United and Wien.

The reduced fare agreement contained the following termination clause:

This Agreement ... shall continue in force and effect until termination by either party, such termination to be effective upon 60 days prior written notice by either party to the other party, to the office designated in this contract....

This termination clause makes no mention of the effect of filing for bankruptcy.

By contrast, the interline agreement contained the following termination clause:

A. Any party hereto may withdraw from the agreement by giving thirty days advance notice of such withdrawal to the other party hereto.

B. However, if the other party has become insolvent, suspended payments or failed to meet its contractual obligations, or has become involved, voluntarily or involuntarily, in proceedings declaring or to declare it bankrupt such notice of withdrawal may become effective on the date of written notice to the other party.

C. A party hereto that ceases to operate scheduled service for 30 days or more for any reason other than a strike shall be deemed to have withdrawn from this agreement, effective 10 days after written notice of such cessation is given to the other party.

Appellant signed both agreements on behalf of KWA and designated Merrill Field, KWA's Anchorage corporate headquarters (also Gifford's business address), as its business address. In testimony Appellant said he agreed to the interline agreement with PSA because it was harmless, if useless:

Q   Okay.   If you didn't want these interline agreements, ... why did you even

sign them—or why were they signed by Mr. Fowler, if you know?

A   They didn't hurt us; they didn't cost us anything; they might be applicable in the future with future expansion plans.  If the other party desired it, that was fine with us.

While Appellant was employed by KWA, KWA attempted to sell itself.  Apparently concerned about the possible effect of such a sale on reduced fare privileges, the Board of Directors of KWA voted to extend reduced travel benefits indefinitely to certain executives, including Appellant, notwithstanding any change in management.[3]

The airline was never actually sold during Appellant's tenure.  However, Rocky Mountain Helicopters, Inc. took over management of KWA and renamed it "Air Forty–Nine, Inc." without exercising its option to purchase the company.

Appellant became ill and retired from KWA in May 1983.  In August 1983, Gifford initiated "Chapter 7" federal bankruptcy liquidation proceedings and a trustee was appointed.  Deborah Pickworth, KWA's secretary/treasurer during its operation, stayed on as KWA's comptroller. KWA was finally sold in 1984, but remained a corporation until November 1985.

Sometime after Appellant left KWA in May 1983, Pickworth gave Appellant blank ticket stock and a validating stamp.  As a practical matter this allowed Appellant to continue to issue himself reduced fare tickets.  Reduced fare billings were to be sent to Pickworth's post office box, instead of the corporate address mentioned in the agreement.  Appellant was to pay Ms. Pickworth personally for the tickets.  Appellant made no effort to determine if the carrying airlines objected, apparently feeling no obligation to do so.[4]

---

**3.** The minutes of the meeting were reduced to one page in writing and signed by the board. They read in pertinent part:

Resolved, that ... and [Appellant] and their eligible dependents, shall be entitled to receive airline travel benefits from the travel industry, they shall be considered corporate officers with regard to such benefits, and the Company shall assist them in obtaining such benefits.  The Company shall not take any action to cause such benefits to be lessened or diminished from their presently existing lev-

els nor will the Company deny them the opportunity to participate in those benefits.

**4.** Appellant testified in cross-examination:

A  We had ... conversations that we had these benefits....  We knew we had these rights; we knew we'd pay for our tickets.  As some plot or motive against some airline companies, no.

.        .        .        .        .

Q  ... Was there ever any inquiry directed to any of the carriers who were going to be

On January 1, 1984, the *Official Airline Guide* informed PSA that KWA had ceased operations. Ms. Galleto did not send KWA a written notice of termination of the reduced fare agreement because "[t]here was no place to communicate any longer with the corporation; it was no longer in business.... There was no need to write letters saying it was suspended." To Ms. Galleto it was a "given."

In June 1985, after having been a sitting judge for approximately six months, Appellant validated blank ticket stock and took a reduced-fare flight from Reno, Nevada to San Francisco, California, on PSA. The ticket contained the identification "Employee Charge" and Appellant's employee ID number.[5] In this instance, PSA sent Appellant's bill for $20.60 to the Merrill Field business address, instead of to Pickworth's post office box, thereby alerting the bankruptcy trustee. The trustee's attorney, Bernd Guetschow, demanded the immediate return of the ticket stock and validating stamp from Appellant. Appellant offered to pay the $20.60 bill, but Guetschow refused to allow Appellant to do so. Appellant then paid PSA directly.

Ms. Galetto testified that in her opinion the reduced fare agreement was ineffective without the interline agreement (which terminated upon the initiation of KWA's bankruptcy proceedings):

> ... You cannot have a reduced fare agreement that allows self-ticketing without an agreement to allow you to do the ticketing.... [T]he ticketing and baggage agreement was null and void. Consequently, no one within Kodiak Alaska Airlines was authorized to write tickets on PSA Airlines any longer. You have to have the ticketing

and baggage agreement to issue a ticket on us. Without it, you cannot do so.

.    .    .    .    .

> [T]here's a fundamental reason ... for a carrier to extend an employee reduced fare agreement to another company. That's—a fluff [sic] thing. That's not a necessity to operating.
> Q Okay.
> A Whereas a ticketing and baggage agreement is a necessity.

Ms. Galetto further testified that PSA corporate policy prevented integrating an interline agreement and a reduced fare agreement into one document. She said that the purpose of having two separate agreements was that PSA did not always extend reduced fare privileges when an interline agreement had been executed.

Ms. Galetto asserted it was unnecessary for PSA to include the same termination provision in both agreements.

> [I]t's unnecessary for two reasons, specifically. One, if a company ceases operation, then they are no longer going to be doing ticketing on another carrier. And the ... reduced fare agreement requires that you can ticket ... since the ticketing and baggage agreement ceases when service ceases, you can't ticket. Secondly ... in the very beginning, it talks about, "[e]ach party shall grant to employees of such airline." Well, if the airline isn't operating, you certainly can't be an employee of it.

Ms. Galetto went on to explain that unauthorized use of the tickets was harmful to PSA in two respects. First, Appellant would otherwise have paid full price for the ticket. Second, Appellant's possession of

---

involved in carrying you or the Pickworths on a reduced fare basis as to whether this arrangement was all right with them?
A I don't recall any.
Q Don't you think it would have been appropriate to do that, given the cessation of operations of Kodiak Western Airlines and the bankruptcy of Gifford?
A ... if you're saying that would I wish I'd have done that now? You bet, Arden. I don't like being here. And maybe if somebody had said, "Hell, no ... you can't do that." ... I'd have probably analyzed it. I'd have looked at

it carefully.... This is the most—this is the most I think I've ever stood up in my life for something that I think was right. And if it had been brought to my attention then, I would have looked at it—just like when Bernd Guetschow brought it to my attention. I still think Bernd Guetschow is wrong. I still think you're wrong. I—I still think I've got those rights.

5. Appellant testified that employee numbers were used even after retirement.

the ticket stock and stamp placed PSA at risk of unauthorized use.[6]

David Jensen, Vice–President of Administration for Reeve Aleutian Airways (Reeve), testified that blank ticket stock and validation stamps were kept either in possession of the ticket agents or locked up. He also testified that he doubted that KWA reduced-fare tickets would have been accepted by those with knowledge of KWA's status at the time.

Appellant, by contrast, sought to show that he in fact had the continued right to issue himself reduced-fare tickets. Both Mr. Jensen and Appellant testified, contrary to Ms. Galetto, that the reduced fare and interline agreements are physically separate and complete contracts on their own, and not necessarily interdependent.[7] Additionally, the parties stipulated to accept Appellant's offer of proof of the expected testimony of attorney Henry Camerot, former counsel for Alaska Airlines:

> Alaska Airlines entered into ticket and baggage agreements with other airlines, and Alaska Airlines entered into reduced fare agreements with other airlines, similar if not identical to the one that you have seen here in two exhibits. It would be his testimony that these are separate documents—that they stand by themselves; that each one is integrated; that you can interpret and apply and enforce the provisions of the reduced fare agreement by itself without reference to the ticket and baggage agreement. And he would testify that the reason for it is the provisions are clear, unambiguous.
>
> He would testify that an airline can cease and does cease flying scheduled operations and still retain employees and

has done that a number of ... times in the past. Things just don't end by way of obligations to employees because the airline ceases flying operations.

However, Appellant knew the bankruptcy trustee had control of KWA's assets at the time he self-ticketed approximately two years after the filing of the "Chapter 7" proceedings. He did not check whether the agreements were still in effect, although he realized that such agreements could be terminated easily, regardless of bankruptcy. Appellant also conceded it would have been reasonable to check whether or not the agreements were still in effect before utilizing the benefits thereof:

> Q Well, wouldn't it be reasonable, as a lawyer, ... to think that given the non-operational status and the Chapter 11 and Chapter 7 proceedings that intimately involved KWA also that there might have been some change in the agreement that they had executed back in 1983, by that time, two years later[?]
>
> A Yes, it's reasonable.
>
> Q But if it's reasonable to think that, then why wouldn't it be reasonable for you to be ... concerned ... when you're still self-ticketing in June of '85?
>
> A I guess I just don't speculate on hypothetical problems, and you're worried about them....

The Commission found that the record did not demonstrate by clear and convincing evidence any actual impropriety by Appellant. The Commission determined that Appellant's claim to a right to indefinite travel benefits through self-ticketing was

---

**6.** According to the testimony of Ms. Galleto: [A]n unauthorized person was walking around with a ... validation plate and ticket stock that could be worth millions and millions of dollars within this industry.

**7.** According to the testimony of Appellant:
Q Do you have to look at the ticket and baggaging agreement to understand what this says?
A No. This is complete in itself.
Q ... And you agreed with his characterization, that the reduced fare agreement was a stand-alone document. Do you recall that?

A That's right.
According to the videotaped deposition of Jensen:
Q ... Is the baggage and ticketing agreement a separate document and a separate, distinct agreement from the reduced fare agreement?
A Generally.
Q Does one depend upon the other?
A Normally, you don't have pass privilege agreements unless you have an interline relationship in the other areas.
Q Is one actually dependent upon it though?
A Not necessarily.

tenuous at best, but sufficient to defeat a finding of actual impropriety. Nevertheless, the Commission found Appellant failed to avoid conduct that created an appearance of impropriety. It further concluded that Appellant's conduct was prejudicial to the administration of justice and brought the judicial office into disrepute, in violation of AS 22.30.011(a)(3)(C) and (D). Additionally, it determined that Appellant violated Canons 1 and 2A of the Code of Judicial Conduct. The Commission determined the appropriate sanction to be public reprimand pursuant to AS 22.30.011(d)(3). After our holding that the Commission has no authority to determine sanctions, but only to recommend them, and remanding for a recommendation as to sanction, *Judge I*, 762 P.2d at 1296, the Commission recommended public censure.

## II. DISCUSSION

■ The Supreme Court of Alaska is the body entrusted with the ultimate decision in matters of judicial qualifications. *Id.* at 1296; *In re Hanson*, 532 P.2d 303, 307 (Alaska 1975).

■ In determining the appropriate sanction in a judicial conduct case, this court will independently evaluate the evidence of record. *Id.* at 309.[8]

The Commission found that Appellant violated AS 22.30.011(a)(3)(C) and (D), which state:

> (a) The commission shall on its own motion or on receipt of a written complaint inquire into an allegation that a judge
>
> (3) ... committed an act or acts that constitute
>
> .     .     .     .     .;
>
> (C) conduct prejudicial to the administration of justice;
>
> (D) conduct that brings the judicial office into disrepute.

The Commission further found that Appellant violated Canons 1 and 2A of the Code of Judicial Conduct:

Canon 1. A Judge Should Uphold the Integrity and Independence of the Judiciary.

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

Canon 2. A Judge Should Avoid Impropriety and the Appearance of Impropriety in all His Activities.

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

■ Alaska statutory law and the Code of Judicial Conduct hold judges to the highest standard of personal and official conduct. This standard is greater than that expected of lawyers and other persons in society. *E.g., In re Inquiry Relating to Rome*, 218 Kan. 198, 542 P.2d 676, 682 (1975); *Complaint Concerning Winton*, 350 N.W.2d 337, 340 (Minn.1984). A judge's unethical or seemingly unethical behavior outside the courtroom detracts from the efficient administration of justice and the integrity of the judicial office, as it diminishes respect for the judiciary in the eyes of the public. *E.g., In the Matter of Haddad*, 627 P.2d 221, 223 (Ariz.1981); *Rome*, 542 P.2d at 683; *Winton*, 350 N.W.2d at 340. Because the purpose of judicial discipline is to protect the public rather than punish the individual judge, the proceeding is neither civil nor criminal but *sui generis*. *Haddad*, 627 P.2d at 223; *McComb v. Comm'n on Judicial Performance*, 138 Cal.Rptr. 459, 564 P.2d 1, 5 (1977); *Rome*, 542 P.2d at 683.

> Members of the judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception

---

8. Suggestions to the contrary in *In re Robson*, 500 P.2d 657 (Alaska 1972) are disapproved.

of the integrity of the judiciary will be preserved.... That is not to say, of course, that Judges must cloister themselves from the day-to-day problems of family and friends. But it does necessitate that Judges must assiduously avoid those contacts which might create even the appearance of impropriety.

*Lonschein v. State Comm'n on Judicial Conduct,* 50 N.Y.2d 569, 430 N.Y.S.2d 571, 572, 408 N.E.2d 901, 902 (N.Y.1980).

■ We agree with the Commission that the record does not sufficiently establish any actual impropriety by Appellant.[9] There is an uncertain question concerning whether Appellant's privilege to self-ticket had terminated; there is not "clear and convincing" evidence that it had. *See Hanson,* 532 P.2d at 310. However, we also agree with its finding that Appellant created an appearance of impropriety, violating Canons 1 and 2A of the Code of Judicial Conduct and hence AS 22.30.011(a)(3)(E) (prohibiting violations of the Code of Judicial Conduct).

■ The duty to avoid creating an appearance of impropriety is one of taking "reasonable precautions" to avoid having "a negative effect on the confidence of the thinking public in the administration of justice." *In the Matter of Bonin,* 375 Mass. 680, 378 N.E.2d 669, 682–83 (1978). Otherwise stated, did Appellant fail to use reasonable care to prevent objectively reasonable persons from believing an impropriety was afoot? The self-validation of reduced fare tickets through a defunct airline, where Appellant 1) knew that the agreement permitting such self-validation could be terminated on short notice, if it had not been already; 2) did not check on the validity of the agreements despite knowing that a bankruptcy trustee had been in control of KWA for almost two years; and 3) admits

that a reasonable lawyer would have consulted with the trustee before self-ticketing, creates a sufficient appearance of impropriety to constitute a violation of Canon 2.[10]

## III. SANCTION

■ In *Disciplinary Matter Involving Buckalew,* 731 P.2d 48, 51–52 (Alaska 1986), we adopted the American Bar Association's Standards for Imposing Lawyer Sanctions as guidelines for sanctioning lawyer misconduct. *See* ABA Standards for Imposing Lawyer Sanctions (1986), *reprinted in* ABA/BNA *Lawyer's Manual on Professional Conduct,* 01:801–01:856 (1986) (hereinafter ABA Standards). We reasoned that the ABA Standards provide a "theoretical framework within which to organize and analyze the relevant factors to be considered in discipline sanction cases." *Buckalew,* 731 P.2d at 52. A framework is needed to "ensure a level of consistency necessary for fairness to the public and the legal system...." *Id.* As we believe such consistency is equally important in matters of judicial misconduct, we will analogize to these standards insofar as possible when sanctioning judges.[11] We note in so doing that the American Bar Association has adopted Standards Relating to Judicial Discipline and Disability Retirement. *See* ABA Standards Relating to Judicial Discipline and Disability Retirement (1978), *reprinted in* National Center for Professional Responsibility for the Joint Committee on Professional Discipline, American Bar Association, *Professional Discipline for Lawyers and Judges* (1979). However, these standards are largely hortatory and prescribe specific sanctions only for a few serious violations not at issue here (commission of a felony or misdemeanor). *Id.*

---

**9.** Therefore, Appellant did not violate AS 22.30.011(a)(3)(C). When misconduct is extra-judicial, as here, it is prejudicial to the administration of justice only if it is "wilful misconduct out of office, i.e. unjudicial conduct committed in bad faith...." *E.g., Spruance v. Comm'n on Judicial Qualifications,* 13 Cal.3d 778, 119 Cal. Rptr. 841, 853, 532 P.2d 1209, 1221 (1975).

**10.** A violation of Canon 2, as it brings the judiciary into disrepute, also violates AS 22.30.011(a)(3)(D).

**11.** The ABA Standards are limited in analogical scope because judges are held to a higher level of scrutiny than are ordinary lawyers. *E.g., Winton,* 350 N.W.2d at 340 (Minn.1984). This is not to say, however, that they are valueless.

The ABA Standards utilize a four pronged test to determine the level of sanction:

(1) What ethical duty did the lawyer violate? (A duty to a client, the public, the legal system, or the profession?)

(2) What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly, or negligently?)

(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?)

(4) Are there any aggravating or mitigating circumstances?

*Buckalew*, 731 P.2d at 52, *quoting* ABA Standards, Theoretical Framework, ABA/BNA at 01:805–06.

The first step in applying the ABA Standards is to examine the first three prongs of the test. Next, we examine the ABA Standards to find the recommended sanction for this type of misconduct. Finally, we ascertain whether any aggravating or mitigating circumstances apply which warrant increasing or decreasing the otherwise appropriate sanction. *Id.*

### 1. *The three pronged test.*

The first prong deals with the ethical duty violated. The ABA Standards do not directly address the problem of creating an appearance of impropriety. Rather, the ABA Standards seek to implement a system for the consistent punishment of Disciplinary Rule violations. The Disciplinary Rules, however, do not mandate the punishment of a lawyer who creates only an appearance of impropriety of the type at issue here. While Ethical Consideration 9–6 contains cautionary language that a lawyer should "strive to avoid not only professional impropriety but also the appearance of impropriety," DR 9–101 prohibits only certain specific types of apparent improprieties not apposite here. *See* DR 9–101(A) (accepting private employment on a matter "upon the merits of which he has acted in a judicial capacity"); DR 9–101(B) (accepting private employment in a matter in which he had substantial responsibility while a public employee); DR 9–101(C) (implying the abili-

ty to improperly influence decision-makers). This is one area in which the Code of Judicial Conduct demands more of judges than the Disciplinary Rules do of lawyers.

The second prong requires examination of the offender's mental state. Our review of the record reveals only a negligent state of mind, not a knowing or purposeful one. The ABA Standards define negligence as "when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." ABA Standards, Definitions, ABA/BNA at 1:807. Appellant's error lies in his negligent failure to appreciate a substantial risk that his self-issuance of reduced fare tickets might appear improper under the circumstances.

The third prong requires examination of the actual or potential harm occasioned by the violation. As far as actual harm, there was relatively little. The trustee of KWA incurred a debt of $20.60, which Appellant intended to pay, and did pay. Assuming that the agreement was in fact inoperative, which is not clearly demonstrated by the evidence, then PSA also suffered the loss of the difference between a $20.60 reduced fare and a full fare of $82.40, or $61.80. If it was not inoperative, no harm was suffered. Additionally, the ticket was a "stand-by" ticket. The potential harm in this case, according to Ms. Galleto, was somewhat greater, assuming the further step of the validation plate falling into the wrong hands. The ABA Standards define potential harm as "the harm ... that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." ABA Standards, Definitions, ABA/BNA at 1:807. We cannot, on this record, say that the consequences feared by Ms. Galleto would "probably" have resulted from Appellant's possession of a validating stamp and blank stock, given the lack of evidence of any nefarious purpose on Appellant's part. Additionally, the validating stamp, which was part of the record,

is no masterpiece of complexity and could be rather easily duplicated. Thus, we feel that the degree of actual or potential injury caused was nearly negligible.

### 2. *Recommended Sanction.*

▮▮▮ As discussed *supra,* no part of the ABA Standards specifically addresses the problem of creating the appearance of impropriety, yet a useful pattern appears throughout. Where the violation, whatever its nature, involves only negligent conduct which occasions little injury, the recommended sanction is admonition, or private reprimand. *See* ABA Standard 2.6, ABA/BNA at 01:813 ("Admonition, also known as private reprimand, is a form of non-public discipline which declares the conduct of the lawyer improper ..."); ABA Standard 4.24, ABA/BNA at 01:820; ABA Standard 4.34, ABA/BNA at 01:824; ABA Standard 4.44, ABA/BNA at 01:826; ABA Standard 4.54, ABA/BNA at 01:827; ABA Standard 4.64, ABA/BNA at 01:828; ABA Standard 5.24, ABA/BNA at 01:832; ABA Standard 6.14, ABA/BNA at 01:834; ABA Standard 6.24, ABA/BNA at 01:836; ABA Standard 6.34, ABA/BNA at 01:837; ABA Standard 7.4, ABA/BNA at 01:839. Since this pattern is consistent throughout the ABA Standards irrespective of the nature of the offense,[12] it is fair to apply it to unaddressed judicial violations involving, as here, the same mental state and degree of injury. Thus, a private reprimand is the baseline sanction for this conduct.[13]

### 3. *Aggravating and Mitigating Factors.*

▮▮▮ The ABA Standards provide for the consideration of aggravating and mitigating factors in deciding whether to depart from the baseline sanction. Mitigating factors include:

(a) absence of a prior disciplinary record;

(b) absence of a dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical or mental disability or impairment;

(i) delay in disciplinary proceedings;

(j) interim rehabilitation;

(k) imposition of other penalties or sanctions;

(*l*) remorse;

(m) remoteness of prior offenses.

ABA Standard 9.32, ABA/BNA at 01:842. Aggravating factors include:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution.

ABA Standard 9.22, ABA/BNA at 01:841–42.

Just as there is "no 'magic formula' to determine which or how many mitigating circumstances justify the reduction of an otherwise appropriate sanction," *Bucka-*

---

**12.** The ABA Standards do urge against admonition for the negligent violation of a standing discipline order, a situation not at issue here. *See* ABA Standard 8.4, ABA/BNA at 01:841.

**13.** Because creation of an appearance of impropriety, where no actual impropriety is demonstrated, is essentially negligent, the baseline sanction will generally be either private reprimand or public censure under the ABA Standards, depending on the amount of harm caused and subject to increase or decrease dependent upon the presence of aggravating or mitigating factors.

*lew*, 731 P.2d at 54, so too is there no formula dictating how many aggravating factors justify increasing a sanction, or how aggravating and mitigating factors are to be balanced. "Each case presents different circumstances which must be weighed against the nature and gravity of the ... misconduct." *Id.*

In this case, several mitigating factors, (a), (b), (e), (f), (g) and (*l*), are present. The record before us contains no evidence that Appellant has ever received a disciplinary sanction, public or private, as an attorney or judge, and we are aware of none. We do not believe the record reflects a "dishonest or selfish motive," but rather negligence. Appellant's attitude toward the proceedings appears to have been cooperative. Although Appellant has practiced law for many years, he had been on the bench for a relatively short period of time, and thus perhaps was less familiar with the Code of Judicial Conduct than might otherwise be the case. Appellant acknowledged his lapse of care during his cross-examination, and expressed remorse.

On the other hand, we find no aggravating circumstances present.

Balancing these factors, we conclude that it would not be appropriate to depart from the baseline sanction of private reprimand. "Our paramount concern, here as always, must be the protection of the public, the courts, and the legal profession." *Buckalew*, 731 P.2d at 56. This paramount concern would be ill served in this case by failing to express in some way our disapproval of Appellant's neglect.

## IV. CONCLUSION

For the reasons stated above, the Commission's recommended sanction of public censure is rejected. This court will administer the private reprimand in closed proceedings.

RABINOWITZ and MOORE, JJ., not participating.