STATE of Alaska, Petitioner,

v.

Brian DUSSAULT, Respondent.

No. A–10444.

Court of Appeals of Alaska.

Jan. 7, 2011.

---

**29.** *See, e.g., Maxwell,* 37 P.3d at 425; *Valentino,* 3 P.3d at 340–41.

James Fayette, Assistant District Attorney, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Petitioner.

Avraham B. Zorea, Anchorage, for the Respondent.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

Brian Dussault was acquitted of first-degree murder by reason of insanity and committed to the Alaska Psychiatric Institute (API) in 1984. Superior Court Judge John Suddock conducted several hearings on Dussault's request for conditional release from this confinement. The State argues that Judge Suddock should be disqualified from further participation, alleging that he engaged in a series of improper ex parte communications with William Hogan, the Commissioner of the Department of Health and Social Services (DHSS). We conclude that Judge Suddock's ex parte communications were not authorized by law and that these communications created an appearance of impropriety that requires his disqualification from this case.

### Background

In 1984, Brian Dussault shot and killed his wife. Dussault was adjudicated not guilty of first-degree murder by reason of insanity and was placed at API in the custody of DHSS. Dussault was conditionally released in 1995 and 1997, but his releases were revoked because he used cocaine in 1995 and absconded after the 1997 release.

Judge John Suddock was assigned to the case in 2003. He conducted annual hearings on Dussault's suitability for release. On February 1, 2008, Judge Suddock conducted an evidentiary hearing on Dussault's renewed motion for conditional release.[1] At the hearing, Judge Suddock expressed his tentative willingness to release Dussault under appropriate conditions of supervision. The judge told Dussault's attorney:

> I can only decide if conditional release is appropriate in the context of a specific plan....
>
> ....
>
> So I can't rule on this thing in a vacuum.... You have to put a package together. But when you do that, I am prepared to move on this....
>
> ....
>
> ... [G]et your ducks in a row and come back and get him into [a residential program in Anchorage]. It's going to take something like that, you know that.

Judge Suddock stated that Dussault's release was contingent upon the approval of a final

1. AS 12.47.092 outlines the "[p]rocedure for conditional release":

    (a) A defendant committed to the custody of the commissioner of health and social services under AS 12.47.090(b) or (c) may be conditionally released from confinement subject to the conditions and requirements for treatment that the court may impose, and placed under the supervision of the Department of Health and Social Services, a local government agency, a private agency, or an adult, who agrees to assume supervision of the defendant.

release plan. The State opposed any release of Dussault based on Dussault's lack of progress at API and his flight from the state following his 1997 release. The medical staff from API also objected to Dussault's release because they believed Dussault remained a threat to the community.

After the February 1 hearing, Judge Suddock began to conduct status hearings to discuss potential plans and conditions for Dussault's release. At a March 27 hearing, Judge Suddock suggested that the Department of Corrections (DOC) might assume responsibility for Dussault. The State responded that DOC was not willing to voluntarily assume responsibility for Dussault and that DHSS, not DOC, was the agency legally responsible for Dussault.

At a hearing on April 28, Judge Suddock again suggested that he believed "the most practical solution [would be] for [DHSS] to plead on bended knee to its sister agency, the Department of Corrections, and to try to induce an arrangement whereby the probation department monitors him." The judge also noted that he "tried informally and off record to get some involvement of somebody who's willing to assume ... responsibility [for Dussault] in a meaningful way," but the judge stated that he was not "able to get any traction."

Eventually, at a May 16 hearing, Assistant Attorney General John Bodick told Judge Suddock that he contacted the DOC Director of Probation and Parole, Donna White, and that DOC was not willing to assume responsibility for Dussault. Judge Suddock continued to hold hearings, but Dussault did not make substantial progress toward assembling a comprehensive release plan.

At a hearing on September 5, Judge Suddock stated that he would be contacting an assistant attorney general representing DHSS to find someone to participate on behalf of the agency. Neither party objected to Judge Suddock's proposed contact with the attorney general's office.

The following month, Judge Suddock attended the Judicial Conference held in Girdwood, where the Commissioner of DHSS, William Hogan, was a speaker. Judge Suddock approached Commissioner Hogan, in-

formed him of the Dussault proceeding, and asked him to designate a DHSS representative to monitor Dussault's status hearings. Judge Suddock also suggested that DOC might assume responsibility for Dussault pursuant to an interdepartmental agreement.

Following this ex parte contact and prior to the next hearing, there were four e-mail communications between Judge Suddock and Commissioner Hogan.

1. *November 20, 2008:* Judge Suddock contacted Commissioner Hogan in an e-mail entitled "Judge Suddock's conundrum." In this e-mail, Judge Suddock indicated that the relevant statute in Dussault's case "decrees release to a representative of [DHSS]." After informing Commissioner Hogan of the date and time of the next hearing, Judge Suddock told the Commissioner that the court was "in general on a track toward release within months if it proves feasible." Judge Suddock suggested that "[i]t would be helpful to engage with [Commissioner Hogan's] department so [he would not be] blind-sided by developing events." Alternatively, Judge Suddock believed that Commissioner Hogan might want an attorney from the Department of Law (DOL) to attend the hearings.

2. *November 21, 2008:* In his reply to Judge Suddock, Commissioner Hogan indicated that he had been counseled by an assistant attorney general to "not get too involved." Commissioner Hogan did, however, offer to testify in open court.

3. *November 23, 2008:* Judge Suddock e-mailed Commissioner Hogan to outline the status of the Dussault hearings and to clarify DHSS's involvement in any plan for Dussault's conditional release. Judge Suddock went on to state that he preferred to have DOC monitor Dussault:

> I feel I would be remiss if I did not alert you to this situation and invite you to monitor it so you are not blind-sided on the eve of any release. It has always seemed to me that a sensible approach would be for [DHSS] to arrange by contract with DOC probation to monitor Dussault, as they do many mentally ill probationers and parolees through a specific program dedicated to case management of difficult men-

tal health cases. I am sure that there are obstacles to such an approach that might require time to overcome. Or perhaps I am not seeing some other reasonable solution.

Judge Suddock did not inform Commissioner Hogan that DOC had already declared that they were not willing to supervise Dussault's release. Given the nature of the proceeding, the judge noted that it would not be "unreasonable" for a DHSS lawyer to attend some or all of the hearings. However, Judge Suddock stated, "But I take no position on the matter, other than to note this is a problem that the parties are not addressing, and that will have to be resolved at some point." He further indicated he would copy the parties on the message. The judge concluded by welcoming the Commissioner's reaction to the "unique situation."

4. *November 24, 2008:* Commissioner Hogan responded by indicating that Judge Suddock's November 23 e-mail again raised the issue of DOC's ability to monitor Dussault under contract with DHSS. The Commissioner stated that he would need to consult with DHSS's attorney to obtain guidance.

The court held an additional hearing on November 25, 2008. At the end of the hearing, Judge Suddock disclosed for the first time that he had been in contact with Commissioner Hogan. The judge gave the parties printouts of the string of e-mails from November 20, 21, and 23. Judge Suddock did not disclose the November 24 e-mail from Commissioner Hogan.

Once the State was apprised of these ex parte contacts, the State filed a motion to disqualify Judge Suddock from further participation in Dussault's case, alleging that Judge Suddock's ex parte communications with Commissioner Hogan created an "appearance of impropriety" that required disqualification under Canon 3E of the Code of Judicial Conduct. Judge Suddock denied the State's motion. Superior Court Judge Michael Spaan was then appointed to determine whether Judge Suddock should be disqualified,[2] and Judge Spaan also denied the State's motion. We granted the State's petition for review of Judge Spaan's decision.

### Discussion

There are two sets of legal rules that apply to judicial disqualification. Alaska Statute 22.20.020(a) lists the types of cases in which a judge is statutorily disqualified from acting. Canon 3E(1) of the Alaska Code of Judicial Conduct lists the circumstances when a judge's disqualification is required by standards of ethical conduct.[3] Neither the statute nor the rule expressly states that unauthorized ex parte communications are a circumstance sufficient to require disqualification. But the Alaska courts have construed the statute to incorporate a requirement identical to the ethical rule: A judge "should disqualify himself or herself in a proceeding in which his impartiality might reasonably be questioned."[4] We must decide whether the ex parte communications between Judge Suddock and Commissioner Hogan created an appearance of partiality requiring disqualification.

We review a trial court's decision regarding disqualification for abuse of discretion.[5] A trial court's decision "is to be accorded great weight and will be reversed on appeal only when it is evident that reasonable persons could not rationally come to the same conclusion on the basis of known facts."[6]

---

2. *See* AS 22.20.020(c).

3. *See generally* Marla N. Greenstein, *Judicial Disqualification in Alaska Courts,* 17 Alaska L.Rev. 53, 71 (2000) ("Although the Alaska Code of Judicial Conduct is only directly enforceable through judicial disciplinary proceedings conducted by the Alaska Commission on Judicial Conduct, it provides guidance to judges in interpreting their ethical obligation to disqualify and has been used by the courts to enhance interpretation of the disqualification statute's full meaning and intent.").

4. *See Pride v. Harris,* 882 P.2d 381, 385 (Alaska 1994) (incorporating the language of former Canon 3C(1)(a)); *Perotti v. State,* 806 P.2d 325, 327 (Alaska App.1991).

5. *Amidon v. State,* 604 P.2d 575, 577 (Alaska 1979).

6. *Alaska Trams Corp. v. Alaska Elec. Light & Power,* 743 P.2d 350, 353 (Alaska 1987); *see also Amidon,* 604 P.2d at 577 (noting that the reviewing court may not overturn the decision of the trial court unless "it is plain that a fair-minded

*Judge Suddock's contacts with Commissioner Hogan were improper.*

Alaska's Code of Judicial Conduct bans ex parte communications regarding pending litigation: "A judge shall not initiate, permit, or consider ex parte communications or other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except as allowed by this Section." [7] Two exceptions to the prohibition on ex parte communications are relevant in the present case. First, "[a] judge may initiate or consider an ex parte communication when expressly authorized by law to do so." [8] Second, "[w]hen circumstances require, a judge may engage in ex parte communications for scheduling or other administrative purposes." [9] Judge Spaan concluded that Judge Suddock's ex parte communications with Commissioner Hogan were authorized by these exceptions. For the reasons explained here, we disagree.

*The ex parte communications were not expressly authorized by law.*

■ Canon 3B(7)(a) indicates that "[a] judge may initiate or consider an ex parte communication when expressly authorized by law to do so." [10] Judge Suddock ruled that his ex parte communications with Commissioner Hogan were authorized by statute, relying on AS 12.47.092. This statute states that a defendant under the custody of the DHSS Commissioner may be conditionally released and placed under the supervision of "[DHSS], a local government agency, a private agency, or an adult, who agrees to assume supervision of the defendant." [11] For individuals conditionally released under the statute, the Commissioner of DHSS or the Commissioner's authorized representative must submit quarterly reports discussing the individual's progress and other relevant in-

formation.[12] Judge Suddock concluded that "it necessarily follows that the Commissioner must be informed that the court is invoking the statute in a particular case, by notifying him that he must act." Judge Suddock stated, "Impliedly, the statute authorizes the court to alert the Commissioner that the time is ripe for him to [designate] his statutory representative."

To conform with Canon 3B(7)(a), a statute must expressly authorize ex parte communications.[13] Alaska Statute 12.47.092 does not expressly state that the judge may initiate ex parte communications with DHSS. Judge Suddock acknowledged the lack of an express provision when he noted that he was "impliedly" authorized to alert the Commissioner about Dussault's status. While the statute arguably authorizes some form of communication for identifying the representative who will report to the court, there is no language in the statute indicating that these communications should be conducted in private. Judge Suddock's ex parte communications with Commissioner Hogan were not authorized by the exception for communications authorized by law. Moreover, these communications went beyond the simple matter of informing the Commissioner that he would be required to designate a representative for reporting purposes.

*The ex parte communications were not required for administrative purposes.*

■ The second exception to the ban on ex parte communications applies to communications for administrative purposes. "When circumstances require," a judge may engage in ex parte communications "for scheduling or other administrative purposes." [14] For a communication to qualify as administrative, the communication cannot address a substan-

---

person could not rationally come to that conclusion on the basis of the known facts").

7.  Alaska Code Jud. Conduct Canon 3B(7).

8.  Alaska Code Jud. Conduct Canon 3B(7)(a).

9.  Alaska Code Jud. Conduct Canon 3B(7)(b).

10.  Alaska Code Jud. Conduct Canon 3B(7)(a).

11.  AS 12.47.092(a).

12.  AS 12.47.092(b).

13.  *Cook v. State,* 36 P.3d 710, 727 (Alaska App. 2001) (noting that because the statute authorizes ex parte applications for temporary restraining orders, "it would appear that Judge Savell did not violate Canon 3(B)(7) when he heard K.A.B.'s *ex parte* petition for a 20–day restraining order").

14.  Alaska Code Jud. Conduct Canon 3B(7)(b).

tive matter or the merits of the case, the judge must reasonably believe "no party will gain a procedural or tactical advantage because the communication is ex parte," and the judge must take "reasonable steps" to notify the parties promptly of the substance of the communication and provide, if practicable, an opportunity to respond.[15] There are several aspects of the communications in this case that suggest that they do not meet the definition of this exception.

The first issue is whether the "circumstances require[d]" the ex parte communications between Judge Suddock and Commissioner Hogan.[16] Court decisions indicate that there are circumstances where the privacy of an ex parte communication is important or impliedly authorized.[17] However, as noted above there are no apparent reasons why Judge Suddock was required to conduct his communications with Commissioner Hogan in private.

The second issue is whether Judge Suddock's discussions addressed substantive matters or the merits of the issues litigated. One example of a nonsubstantive administrative communication is where "the sole purpose of the communication is to provide courtesy notification to the parties or to the court of a delay or change in scheduling."[18]

Judge Suddock went beyond the scope of the administrative exception by indicating his preference for DOC monitoring of Dussault. Though Judge Suddock noted DHSS's responsibilities and the status of the case, he also invited "reaction[s]" from Commissioner Hogan on the "unique situation." The title of the e-mail, "Judge Suddock's conundrum," implies that Judge Suddock was contacting Commissioner Hogan with the goal of solving a problem.

Judge Suddock acknowledged that his contacts with Commissioner Hogan were aimed at encouraging the Commissioner to offer a second opinion on whether DOC might assume responsibility for Dussault. In his order, Judge Suddock noted that DOC Director of Probation and Parole Donna White had announced that DOC was not willing to assume responsibility for supervising Dussault's release. But the judge openly criticized White's decision, and he hinted that Commissioner Hogan might be able to convince White's supervisors to override her decision: "While [Director White's] response may be astute, it may also be the type of small-bore thinking that her more flexible supervisors would override." Rather than simply providing a "courtesy notification" regarding the hearing schedule, or a similar administrative communication, Judge Suddock went beyond the scope of the administrative exception and solicited feedback on these substantive matters.

The third issue is whether Judge Suddock took "reasonable steps to notify all other parties promptly of the substance of the ex parte communication."[19] The commentary to Canon 3B(7) indicates that the drafters contemplated a relatively instantaneous means of disclosure for ex parte communications: "the most expeditious means of communication reasonably available to the court."[20] Under this standard, the October communication with Commissioner Hogan was not disclosed "immediately"—it was disclosed after a four-week delay.

The final issue is whether Judge Suddock allowed the State an opportunity to respond.

15. Alaska Code Jud. Conduct Canon 3B(7)(b) (authorizing ex parte communications for administrative purposes "when circumstances require").

16. Alaska Code Jud. Conduct Canon 3B(7)(b).

17. See, e.g., United States v. Nguyen, 262 F.3d 998, 1004 (9th Cir.2001) (suggesting that for an inquiry with a party regarding the substitution of counsel to be adequate, the "court should question the attorney or [the] defendant 'privately and in depth' " (quoting United States v. Moore, 159 F.3d 1154, 1160 (9th Cir.1998))); Thompson v.

State, Mem. Op. & J. No. 4715, 2003 WL 21279425, at *4 (Alaska App. June 4, 2003) (holding that a judge's ex parte questioning of the defendant about a substitution of counsel issue was appropriate under the circumstances).

18. Alaska Code Jud. Conduct Canon 3B(7)(b) cmt. para. 8.

19. Alaska Code Jud. Conduct Canon 3B(7)(b)(iii).

20. Alaska Code Jud. Conduct Canon 3B(7) cmt. para. 9.

Judge Suddock indicated at an April hearing that he had been acting informally to try to get other parties involved. And at a September hearing, Judge Suddock mentioned that he would try to contact an assistant attorney general representing DHSS. But Judge Suddock's statement indicated the court would contact a DHSS attorney, not that the court would ask Commissioner Hogan to intervene in an attempt to convince DOC to monitor Dussault. Judge Suddock never told the parties that he intended to personally contact the commissioner of DHSS for input nor did he give the prosecutor an adequate opportunity to respond.

We conclude that Judge Suddock's communications with Commissioner Hogan were neither authorized by law nor allowed by the exception for administrative purposes.

*These ex parte communications created an appearance of partiality.*

■ As noted above, the disqualification statute and the Code of Judicial Conduct require a judge to be disqualified from any proceeding when the judge's participation creates an appearance of partiality. An appropriate test for the appearance of partiality is suggested by the commentary to Canon 2A: "The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired." [21]

This test is consistent with the reported cases in disqualification and disciplinary matters. In one case, a district court judge wrote to the commissioner of the Department of Public Safety regarding the driver's license of a defendant who had been convicted of driving while his license was suspended. [22] The Alaska Supreme Court found that there was an appearance of bias where the judge's actions "so intertwined the roles of advocate . . . and judge" as to call his impartiality into question. [23]

In another case, a district court judge passed a note to an Alaska State Trooper regarding his testimony about the terms of a domestic violence restraining order. [24] The Alaska Supreme Court noted that the trooper was a member of the prosecution team and that the ex parte communication created an appearance of impropriety. [25]

In a third case, a judge's law clerk leaked a bench memorandum to a prosecutor along with an ex parte note suggesting that she was motivated by her favoritism toward the prosecution. [26] This court remanded for an investigation of the clerk's misconduct, noting that judicial officers are required to supervise their staff to avoid creating the appearance of partiality. [27]

Additionally, the Commission on Judicial Conduct found an appearance of impropriety where a judge sought legal advice about a pending matter from the head of the state office responsible for handling litigation on that legal issue, even though the judge subjectively believed the individual was a "disinterested expert." [28]

In this case, Judge Spaan concluded that a reasonable person would view the proceedings at the time of the State's motion as "akin to a 'problem solving'" session where "the adversary element of the proceedings had given way to the universally held inter-

21. Alaska Code Jud. Conduct Canon 2A cmt.; *see Keller v. State,* 84 P.3d 1010, 1012 (Alaska App. 2004) (noting that this test applies to the appearance of impartiality).

22. *In re Robson,* 500 P.2d 657, 663–64 (Alaska 1972) (holding that there was an appearance of partiality when a judge wrote a letter to the Commissioner of Public Safety on behalf of a motorist charged with driving with a suspended license), *disapproved of on other grounds, In re Inquiry Concerning a Judge,* 788 P.2d 716, 722 n. 8 (Alaska 1990) (holding that the court must independently evaluate the evidence in a judicial conduct case).

23. *Id.* at 664.

24. *In re Cummings,* 211 P.3d 1136, 1138 (Alaska 2009).

25. *Id.* at 1139.

26. *Vaska v. State,* 955 P.2d 943, 944 (Alaska App.1998).

27. *Id.* at 945–46.

28. Alaska Comm'n on Jud. Conduct, Formal Op. No. 15 (1992).

est of constructing release conditions that protect the public while still affording Dussault his rights and advancing his treatment." Judge Spaan reasoned that the communications did not address the substance of a matter still at issue before the court and instead only served to widen the scope of government participation in the hearings.

We disagree. At the time of the communications, Judge Suddock was aware that the staff of API (employees of DHSS) opposed Dussault's release and that Dussault had yet to propose a viable plan for his release or monitoring. The judge was also aware that DOC representatives had declared that they had no legal responsibility to supervise Dussault's release and had declined to supervise Dussault voluntarily. The judge's communications with Commissioner Hogan suggested that the judge wanted the commissioner to convince DOC to supervise Dussault (contrary to the "small bore thinking" of Director White that had been presented in court). These communications created a reasonable appearance of partiality. Based on these ex parte communications a reasonable person would conclude that Judge Suddock had compromised his role as impartial judge of Dussault's proposals for supervised release and had become an advocate for Dussault's release.

### Conclusion

We conclude that Judge Spaan should have granted the State's motion for disqualification. We REVERSE the order denying the motion and REMAND for assignment of another judge.

MANNHEIMER, Judge, concurring.

I write separately to emphasize, or perhaps encapsulate, our analysis of the situation presented in this appeal.

The State's challenge to Judge Suddock's continued participation in Dussault's case arose from the judge's series of *ex parte* contacts with the Commissioner of Health and Social Services. However, as Judge Bolger points out in the lead opinion, the fact that a judge has engaged in improper *ex parte* contacts does not, standing alone, necessarily require the judge's disqualification.

The ultimate question is whether the judge's actions, assessed in light of the totality of the relevant circumstances, would cause a reasonable person to question the judge's ability to be impartial in future proceedings in the case. Alaska Judicial Canon 3(E)(1); *Amidon v. State,* 604 P.2d 575, 578 (Alaska 1979).

As explained in the lead opinion, Brian Dussault was placed in the legal custody of the Department of Health and Social Services as a result of a jury finding that he was not guilty of murder by reason of insanity. The Department committed Dussault to the Alaska Psychiatric Institute. Dussault petitioned the superior court to grant him supervised release from this involuntary commitment. Both the State (*i.e.,* the Department of Law) and the doctors at API opposed Dussault's release, but Judge Suddock declared that he was tentatively in favor of granting Dussault's request—if Dussault could come up with a satisfactory plan for this supervised release.

It turned out that the devil was in the details. For various reasons, it would have been problematic for the Department of Health and Social Services to supervise Dussault's community release. Judge Suddock suggested that Dussault's release might be supervised by the Department of Corrections, an agency that presumably had better capacity to supervise Dussault. But the assistant attorney general representing the Department of Corrections pointed out that, under the pertinent statutes, the Department had no legal responsibility toward Dussault.

The Department of Corrections' attorney also told Judge Suddock that he had spoken to Donna White, the Director of Probation and Parole (*i.e.,* the Corrections official in charge of supervising offenders), and Director White had said that the Department was not willing to voluntarily undertake the task of supervising Dussault, because her personnel were already overburdened.

Confronted with this situation, Judge Suddock initiated a series of *ex parte* approaches (both in person and by e-mail) to the head of the Department of Health and Social Services, Commissioner William Hogan.

In his initial, face-to-face conversation with Commissioner Hogan, Judge Suddock suggested that Dussault's release could be accomplished by having the Department of Health and Social Services enter into an inter-agency contract with the Department of Corrections, and the judge asked Commissioner Hogan to designate a representative to monitor Dussault's case. When Commissioner Hogan did not respond to this request, the judge sent e-mails to the commissioner, reminding him of their conversation, giving some details of the litigation, and again asking the commissioner to appoint a representative to monitor the proceedings.

When Judge Suddock broached his plan for an inter-agency agreement to Commissioner Hogan, the judge apparently did not inform the commissioner that the State (*i.e.,* the Criminal Division of the Department of Law) was opposed to Dussault's release and that the Department of Corrections (through their attorney and, indirectly, through Director White) had likewise announced their opposition to the judge's plan.

Because Judge Suddock was still pursuing this plan, and because the judge presented his plan to Commissioner Hogan in a series of *ex parte* communications, the State contended that the judge's approaches to the commissioner gave a reasonable appearance that the judge was privately soliciting Commissioner Hogan's support for his plan—and that the judge was therefore taking on the role of advocate.

In his written decision denying the State's motion for recusal, Judge Suddock rejected this contention. But the wording of the judge's decision actually supports the State's position—because that written decision reads like a brief in support of the judge's plan to release Dussault to the supervision of the Department of Corrections:

> The [Department of Corrections'] Probation Department has a unit which supervises profoundly mentally ill probationers. . . . DOC is able to provide weekly [urinalysis services]. [The Department] works with virtually all [the] community resources which support mentally ill probationers. Mr. Dussault is the functional equivalent of a candidate for probation. [Because the

Department of Health and Social Services] may lack similar[ ] . . . resources[, it] was appropriate [for me] to alert Commissioner Hogan to this potential option [for Dussault's release]. . . .

> It is discouraging that the prosecution finds this suggestion, which the [C]ourt has repeatedly made on the record, to imply partiality when it was conveyed [*ex parte* ] to the Commissioner. The prosecutor's [apparent belief] is that[,] once Assistant AG [John] Bodick [*i.e.,* the lawyer representing the Department of Corrections] queried [P]robation [D]irector White [about this plan], her opinion was final. [But Director White's] response may be . . . the type of small-bore thinking that her more flexible supervisors would override.

This passage supports the State's position that a reasonable person, aware of the history of this litigation and the content of Judge Suddock's private communications with Commissioner Hogan, would reasonably suspect that the judge was asking the commissioner (in so many words) to lobby the Department of Corrections to alter its position and agree to supervise Dussault's release from API under an inter-departmental contract with Hogan's agency, the Department of Health and Social Services.

This series of *ex parte* contacts was improper. The Department of Corrections had announced its position on this matter through its lawyer and, indirectly, through a senior department official (Director White). It might have been proper for Judge Suddock to openly ask the Department to reconsider its position. But instead, it appears that Judge Suddock tried to alter the Department's stance by privately asking a third party—Commissioner Hogan—to lobby White's superiors in the Department of Corrections to reverse her decision.

A reasonable person would suspect that when Judge Suddock pursued these actions, he assumed the role of an advocate rather than an impartial arbiter. It reasonably appeared that the judge was no longer waiting to evaluate whatever plan Dussault's lawyer might propose for Dussault's supervised re-

lease—that, instead, the judge had a particular type of supervised release in mind, and he was privately attempting to influence state officials to agree to his plan.

In light of Judge Suddock's actions, a reasonable person who was conversant with all the pertinent circumstances would question the judge's ability to impartially adjudicate Dussault's case. Accordingly, pursuant to Judicial Canon 3(E)(1), Judge Spaan should have ordered Judge Suddock's disqualification from further participation in Dussault's case.