**In the matter of the proceeding under AS 22.30.070(c) in relation to Karl S. JOHNSTONE, Petitioner.**

No. S–8387.

Supreme Court of Alaska.

May 19, 2000.

Order On Petitioner's Motion, July 12, 2000.

George N. Hayes and Donald C. Thomas, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Petitioner.

Matthew D. Jamin and Walter W. Mason, Jamin, Ebell, Schmitt & Mason, Kodiak, Special Counsel to the Judicial Conduct Commission, for the Commission.

Before BRYNER, Justice, MANNHEIMER, PENGILLY, STEINKRUGER, and ZERVOS, Justices pro tem.[*]

## O P I N I O N

BRYNER, Justice.

The Alaska Commission on Judicial Conduct recommended to this court that former Superior Court Judge Karl Johnstone be publicly reprimanded for creating an appearance of impropriety in the hiring of Richard McVeigh as coroner for the Third Judicial District of Alaska. We reject Judge John-

stone's contention that the judge's retirement divested the commission of jurisdiction over his disciplinary proceedings, and we agree with the commission that Judge Johnstone's conduct created an appearance of impropriety. We therefore accept the commission's recommendation to issue a public reprimand.

## I. FACTS AND PROCEEDINGS

In 1994 Alaska's coroner for the Third Judicial District resigned. As presiding judge for the Third District, Alaska Superior Court Judge Karl Johnstone was responsible for appointing a new coroner. The coroner position was classified as a partially exempt position, which, among other things, meant that Judge Johnstone was free to appoint a coroner without engaging in a standard hiring process. Nonetheless, when Judge Johnstone instructed the area court administrator, Albert Szal, to commence the recruitment process, Szal initiated a standard merit process. A merit hire, in contrast to a partially exempt appointment, requires a structured process involving publicity, specific application requirements, deadlines, and assignment to eligibility lists.

Szal issued a standard recruitment bulletin, which was posted in court buildings and published in major newspapers throughout the state. The bulletin specified that interested applicants should possess certain minimum qualifications, including: supervisory or managerial experience; a degree in business administration, government, public administration, or a related field; and three years of experience in a coroner's office, public health setting, hospital, clinic, or a court system. Following the application deadline, the court system's personnel office screened the applications and determined that thirty-nine individuals had the appropriate qualifications for the job. Further screening narrowed the field to eight finalists.

On December 6, 1994, Szal appointed a committee to interview these finalists and rank them according to predetermined criteria. After the interviews, the committee agreed that one particular individual stood

---

[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

out from the others and that two others were a close second and third.

At some point during the recruitment process—the parties dispute the precise time—Judge Johnstone informed Szal that he wanted the person that he appointed to have legal training and experience. This criterion had not been included in the recruitment bulletin for the coroner's position. On or about December 15, 1994, when Szal conveyed the results of the interview process, Judge Johnstone expressed dissatisfaction that none of the top-ranked candidates had legal training. The judge discussed the situation with his own supervisor, then-Chief Justice Daniel Moore. Chief Justice Moore suggested that Richard McVeigh either had applied or might apply for the coroner position. McVeigh had legal training and a history of employment in public service; he was also a personal friend of the chief justice.

Shortly after this meeting, Judge Johnstone called McVeigh and discussed the job with him. McVeigh applied for the job the following day, submitting only a resume and cover letter—not the standard application form that all other applicants had submitted. The final application deadline for the position had already passed when McVeigh submitted these materials. Szal was out of the office on a short vacation. Judge Johnstone contacted Szal's secretary and told her that he wanted the committee to interview McVeigh. Three days later—on December 19, 1994—the committee interviewed McVeigh.

After interviewing McVeigh, the committee decided to adhere to its original ranking of the top candidates. The committee did not inform Judge Johnstone of its reasons for giving McVeigh a low ranking. But Szal met with the judge and told him that the committee still favored the candidates it had originally recommended and that McVeigh ranked about sixth among all interviewed applicants. Judge Johnstone nevertheless responded that he was appointing McVeigh.

On December 20, 1994, Judge Johnstone met with the chief justice and Szal to discuss the appointment. During the meeting, Judge Johnstone placed a call to then-Deputy Court Administrative Director Stephanie Cole. Cole advised against considering McVeigh's application, pointing out that McVeigh was probably ineligible because he filed his application after the deadline. Cole warned that accepting the late application could jeopardize the credibility of the court system's hiring process. She also insisted that the only proper way to consider McVeigh's application would be to close out the original merit hiring process and begin an entirely new process.

Judge Johnstone ordered Szal to close out the application process and to send rejection letters advising all candidates that none had been selected and that a new hiring process would be initiated. Szal believed that he could not justifiably declare all thirty-nine candidates unsuitable for the job. Although he informed or reminded Judge Johnstone that the applicant pool included other attorneys, the judge showed no interest in reviewing those applicants. On December 21, 1994, Szal sent rejection letters informing all candidates that "the presiding judge chose not to select any of the candidates and to close this particular process." The letters also informed applicants that "[t]he presiding judge has sought to fill the position through a subsequent selection process."

But no "subsequent selection process" occurred. On December 20, Szal telephoned McVeigh to discuss his appointment as coroner. When initially offered the job, McVeigh was reluctant to accept it on a permanent basis because he did not want to jeopardize his previously earned state retirement payments. Szal reported this development to Judge Johnstone later that day. The judge directed Szal to appoint McVeigh on a temporary basis.

At Judge Johnstone's direction, Szal spoke with Cole about the possibility of hiring McVeigh as a temporary employee, which would enable him to continue to receive his previously earned state retirement benefits. Cole counseled against this approach.

Nevertheless, on December 29, McVeigh's appointment as coroner was announced. Soon afterward, Judge Johnstone left Alaska on vacation without signing a formal appointment order. Sometime during the first week of January 1995, Judge Johnstone transmit-

ted (or had someone transmit) to the acting presiding judge a proposed order appointing McVeigh as a temporary employee for an indefinite term. But Cole concluded that a temporary appointment for an indefinite term would be illegal. She therefore counseled the acting presiding judge not to sign the proposed order.

Judge Johnstone, through Szal, then submitted a second order by fax, proposing to appoint McVeigh as temporary coroner for a term of eleven months. On January 6 Cole sent the judge a memo recapping prior events and expressing uncertainty as to whether McVeigh's appointment would actually be temporary: "I asked Al Szal today if, in fact, Mr. McVeigh's appointment had an expected duration of eleven months or less. Al indicated that he did not know."

Cole advised Judge Johnstone that he might apply through established administrative channels for an exemption authorizing him to fill the coroner's position with a temporary employee. Cole feared that if Judge Johnstone acted without such an exemption, he would seriously endanger the integrity of the court by making it appear that he had permanently hired McVeigh as a temporary employee merely to enable McVeigh to collect his retirement benefits.

On January 11 Szal sent Cole a memo responding that "Presiding Judge Karl Johnstone has informed me that he does not expect Richard McVeigh to occupy the position of coroner for more than 11 months. Therefore, ... Mr. McVeigh can be placed on the payroll as a temporary employee." McVeigh was then appointed.

Soon after McVeigh's appointment, the commission received a complaint alleging that Judge Johnstone had committed ethical violations in his hiring of McVeigh. The commission began a preliminary investigation in February 1995. Judge Johnstone retired from the bench in July 1996. Following the conclusion of its preliminary investigation, in February 1997, the commission hired

special counsel to prosecute the case and issued a Notice of Formal Investigation. Approximately three months later, upon a finding of probable cause, the commission issued a complaint. A formal disciplinary hearing was held on October 27, 28, and 29, 1997, and the commission issued its unanimous decision on November 19, 1997. The commission found the evidence insufficient to establish actual impropriety but sufficient to support the conclusion that Judge Johnstone had created an appearance of impropriety in hiring McVeigh. Based on these findings, the commission recommended that Judge Johnstone be publicly reprimanded.

The commission's findings and recommendation are now before this court for review.[1]

## II. DISCUSSION

### A. Alaska's Provisions for Judicial Discipline

Article IV, section 10 of the Alaska Constitution establishes the Commission on Judicial Conduct, and states that the commission's powers and duties shall be established by law.[2] Alaska Statute 22.30.011 provides that the commission shall inquire into an allegation that a judge has committed an act or acts that constitute:

(A) wilful misconduct in office;

(B) wilful and persistent failure to perform judicial duties;

(C) conduct prejudicial to the administration of justice;

(D) conduct that brings the judicial office into disrepute; or

(E) conduct in violation of the code of judicial conduct[.]

The commission investigated Judge Johnstone for violations of provisions (A), (C), (D), or (E). The commission also investigated Judge Johnstone for violations of Canons 2 and 3B(4) of Alaska's former Code of Judicial Conduct.[3]

Former Canon 2 provided:

---

1. *See* AS 22.30.011(c)(2).

2. *See* Alaska Const. art. IV, § 10; *see also* AS 22.30.010.

3. The Alaska Code of Judicial Conduct was amended in 1998; the provisions applicable to these proceedings are the 1997 versions quoted here.

*A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities.*

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

Former Canon 3B(4) provided:

A judge should not make unnecessary appointments. He should exercise his power of appointment only on the basis of merit, avoiding nepotism and favoritism. He should not approve compensation of appointees beyond the fair value of services rendered.

Alaska Statute 22.30.011(a)(3) authorizes the commission to begin an investigation within six years after judicial misconduct allegedly occurs:

The commission [on judicial conduct] shall on its own motion or on receipt of a written complaint inquire into an allegation that a judge ... within a period of not more than six years before the filing of the complaint or before the beginning of the commission's inquiry based on its own motion, committed an act or acts [of misconduct or apparent misconduct].

Alaska Statute 22.30.080(2) broadly defines "judge" for disciplinary purposes to include any judicial officer who is the subject of an investigation:

"[J]udge" means a justice of the supreme court, a judge of the court of appeals, a judge of the superior court, or a judge of the district court who is the subject of an investigation or proceeding under § 10, art. IV, Constitution of the State of Alaska and this chapter, including a justice or judge who is serving a full-time, part-time, permanent, or temporary position.

B. *The Commission Retains Jurisdiction over Judge Johnstone Despite His Retirement.*

1. *Standard of review*

▮▮▮ The Alaska Supreme Court exercises its independent judgment in matters of statutory interpretation.[4] "Statutory construction begins with an analysis of the language of a statute construed in view of its purpose."[5] We attempt to "give effect to the intent of the legislature, with due regard for the meaning that the statutory language conveys to others."[6] Although we normally give unambiguous language its plain meaning, we may rely on legislative history as a guide to interpreting a statute.[7] But the "plainer the language of a statute, the more convincing contrary legislative history must be" to interpret a statute in a contrary manner.[8]

2. *The definition of "judge" in AS 22.30.080(2) includes individuals who were acting in a judicial capacity at the time the alleged misconduct occurred.*

▮▮▮ Judge Johnstone argues that AS 22.30.080(2) establishes that current active judicial service in a "full-time, part-time, permanent, or temporary position" is a prerequisite to disciplinary jurisdiction. He thus maintains that his voluntary retirement in July 1996 divested the commission of jurisdiction. The commission, on the other hand, contends that its jurisdiction will always extend to an individual who was a judge at the

4. *See In re Inquiry Concerning a Judge,* 762 P.2d 1292, 1293 (Alaska 1988).

5. *Ganz v. Alaska Airlines, Inc.,* 963 P.2d 1015, 1017 (Alaska 1998) (quoting *Borg–Warner Corp. v. Avco Corp.,* 850 P.2d 628, 633 n. 12 (Alaska 1993)).

6. *Id.* (quoting *City of Dillingham v. CH2M Hill Northwest, Inc.,* 873 P.2d 1271, 1276 (Alaska 1994)).

7. *See id.*

8. *Id.* at 1019.

time the alleged misconduct occurred, even if that individual has since retired, as long as it commences investigation within the six-year limitation period.

We agree with the commission that it retains jurisdiction over Judge Johnstone despite his retirement. We reach this conclusion based on the plain language of Alaska's statutes, which extend the commission's jurisdiction to any "judge" who is "the subject of an investigation." [9] Here, Judge Johnstone was actively serving as a full-time and permanent judge of the superior court both when the alleged misconduct occurred and when the commission opened its investigation.[10] Because the commission began its investigation within the six-year limitation period and Judge Johnstone was then an active judge, the commission unquestionably acquired jurisdiction over the alleged misconduct. Having properly acquired jurisdiction, the commission did not lose it merely because the judge subsequently opted to retire.

■ Judge Johnstone argues that the six-year limitation period of AS 22.30.011(a)(3) refers to "how far back the Commission can look in considering a judge's actions," but does not define the scope of the commission's jurisdiction. But we decline to read the provision so narrowly. The provision is plainly worded: the commission may investigate alleged wrongdoing by an active judge as long as a complaint is filed or inquiry commenced within six years of the alleged actions.

The legislative history of this provision supports its plain meaning, weighing strongly in favor of retained jurisdiction. Alaska's judicial disciplinary scheme was discussed during the 1989–90 legislative session in the context of proposed House Bill 268.[11] House Bill 268 altered and clarified Alaska's judicial disciplinary scheme in several respects. One of the changes proposed in the infancy of H.B. 268 was to include "retired judges" in the definition of judge.[12] This proposed language was ultimately rejected.[13] While the reasons underlying the legislature's decision to reject this language are irrelevant here, the discussion prompted by the rejection is highly significant. During a meeting of the House Judiciary Committee, one representative questioned whether eliminating the words "retired judge" would allow a judge to retire in order to avoid being reprimanded or falling under the commission's jurisdiction.[14] The ensuing discussion clarified the judiciary committee's belief that, notwithstanding the absence of specific definitional language covering a "retired judge," a judge who was alleged to have committed an ethical violation while on active duty would remain subject to judicial misconduct proceedings even if a charge had not yet been filed as of that judge's retirement.[15]

The American Bar Association (ABA) agrees with this approach.[16] The ABA's Model Rules for Judicial Disciplinary Enforcement specify that a disciplinary commission should have continuing jurisdiction over former judges.[17] The Commentary to this rule explains:

This continuing jurisdiction ensures that judges cannot avoid judicial discipline by resigning before information regarding their misconduct was made known to disciplinary counsel and thereafter seek judicial office with no record of misconduct.[18]

A majority of states agree with the ABA that a disciplinary body retains jurisdiction

---

9. AS 22.30.080(2).

10. *See id.*

11. *See* 1989 House Journal 869 (House Bill 268).

12. *See* Minutes of House Judiciary Comm. (Mar. 5, 1990).

13. *See* Minutes of House Judiciary Comm. (Mar. 2, 1990). The version of H.B. 268 excluding "retired judge[s]" was signed into law in September 1990. *See* Ch. 135, SLA 1990; AS 22.30.080(2).

14. *See* Minutes of House Judiciary Comm. (Mar. 5, 1990).

15. *See id.*

16. Alaska's Code of Judicial Conduct is based on the ABA's Model Code of Judicial Conduct, with some modifications. *See* Preamble, Alaska Code of Judicial Conduct.

17. *See* ABA Model Rules for Judicial Disciplinary Enforcement, Rule 2(b)(2)(1994).

18. *See id.,* Commentary at 14.

over a judge who has voluntarily retired after alleged acts of misconduct.[19] Even courts that consider certain sanctions to be mooted by a judge's voluntary resignation still retain jurisdiction.[20] Many of these courts support their retention of jurisdiction by citing the need to preserve public confidence in the judiciary.[21]

Public respect for the judicial branch is a paramount concern. In fact, the ABA Model Code of Judicial Conduct was created largely to address a crisis of confidence in the judiciary.[22] Both the Model Code and the Alaska Code of Judicial Conduct state in their preambles:

> Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all Sections of this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a

public trust and strive to enhance and maintain confidence in our legal system.

Judge Johnstone argues that because "the Alaska disciplinary scheme contemplates *private* reprimands and censures, AS 22.30.070, it is clear that education of the public, or even of the bench generally, is not a primary goal of judicial discipline in Alaska." We disagree.

■ In addition to the exhortation contained in the preamble to the Alaska Code of Judicial Conduct, quoted above, we have held that a primary purpose of judicial discipline in Alaska is to protect the public rather than to punish the judge.[23] In *In re Inquiry Concerning a Judge* [*Judge II*], we noted:

> Alaska statutory law and the Code of Judicial Conduct hold judges to the highest standard of personal and official conduct .... [a] judge's unethical or seemingly unethical behavior outside the courtroom detracts from the efficient administration of justice and the integrity of the judicial office, as it diminishes respect for the judiciary in the eyes of the public.... [T]he

19. *See, e.g.,* Cal. Const. art. VI, § 18(d); M.G.L.A. 211C § 2(2); N.Y. Jud. Law § 47 (McKinney 1983); 42 Pa.C.S.A. § 102; R.I. Sup. Ct. Rules, art. VI & Commentary; *In re Weeks,* 134 Ariz. 521, 658 P.2d 174, 176 (1983); *Kennick v. Commission on Judicial Performance,* 50 Cal.3d 297, 267 Cal.Rptr. 293, 787 P.2d 591, 596–97 (1990); *In re Inquiry Relating to Dist. Judge Harold L. Hammond,* 224 Kan. 745, 585 P.2d 1066, 1067 (1978); *In re Cox,* 658 A.2d 1056, 1057–58 (Me.1995); *In re Probert,* 411 Mich. 210, 308 N.W.2d 773, 775–76 (1981); *In re Yaccarino,* 101 N.J. 342, 502 A.2d 3, 30–31 (1985); *In re Backal,* 87 N.Y.2d 1, 637 N.Y.S.2d 325, 327–28, 660 N.E.2d 1104 (1995); *In re Sherrill,* 328 N.C. 719, 403 S.E.2d 255 (1991); *In re Judicial Inquiry and Review Bd. v. Snyder,* 514 Pa. 142, 523 A.2d 294, 298 (1987), *cert. denied,* 484 U.S. 829, 108 S.Ct. 100, 98 L.Ed.2d 61 (1987); *In re Fuyat,* 578 A.2d 1387, 1388–89 (R.I.1990); *In re Chiles,* 327 S.C. 105, 490 S.E.2d 259, 260 (1997); *In re Sheppard,* 815 S.W.2d 917, 920 (Tex.Spec.Ct.Rev.1991); *In re Steady,* 161 Vt. 636, 641 A.2d 117, 118 (1994); *Judicial Hearing Bd. v. Romanello,* 175 W.Va. 577, 336 S.E.2d 540, 541 (1985); *In re Complaint Against Sterlinske,* 123 Wis.2d 245, 365 N.W.2d 876 (1985).
 On the other hand, the federal government and approximately five states allow a judge the option of voluntary resignation to avoid investing resources in disciplinary proceedings and to avoid a public spectacle. *See In re Dempsey,* 101 Ill.Dec. 58, 498 N.E.2d 240, 240 (Ill.1986); *In re*

*Moroney,* 259 Kan. 636, 914 P.2d 570, 574 (1996); *In re Naccari,* 657 So.2d 91, 91 (La. 1995); *In re DeLucia,* 76 N.J. 329, 387 A.2d 362, 365 (1978); *In re Fienberg,* 139 Vt. 511, 430 A.2d 1282, 1283 (1981); *see also* Emily Field Van Tassel, *Resignations and Removals: A History of Federal Judicial Service—And Disservice—1789–1992,* 142 U. Pa. L.Rev. 333, 348, 364 (1993).

20. *See, e.g., Snyder,* 523 A.2d at 298; *In re Brown,* 334 S.C. 44, 512 S.E.2d 114 (1999).

21. *See, e.g., In re Cox,* 658 A.2d at 1057; *In re McKenney,* 384 Mass. 76, 424 N.E.2d 194, 199 (1981); *In re Yaccarino,* 502 A.2d at 30; *In re Fuyat,* 578 A.2d at 1389.
 Some other reasons cited by these courts include the possibility that the judge might return to the bench in a pro tempore capacity, providing guidance to other judges, and ensuring that the transgression is public knowledge so that persons wishing to employ the services of a retired judge (as a mediator, for example) would be aware of it. *See, e.g., In re Weeks,* 658 P.2d at 176; *In re Steady,* 641 A.2d at 118; *In re Complaint Against Sterlinske,* 365 N.W.2d at 876.

22. *See* Jaime S. Dursht, *Judicial Plagiarism: It May Be Fair Use But is it Ethical?,* 18 Cardozo L.Rev. 1253, 1282, 1283 (1996).

23. *See In re Inquiry Concerning a Judge* [*Judge II*], 788 P.2d 716, 722 (Alaska 1990).

*purpose of judicial discipline is to protect the public rather than punish the individual judge [.]* [24]

The public may be "protected" by judicial discipline in several ways. One way to protect the public is to remove the offending judge from office. And as we observed in the foregoing passage, another way to protect the public is to keep it informed of judicial transgressions and their consequences, so that it knows that its government actively investigates allegations of judicial misconduct and takes appropriate action when these allegations are proved.[25] Judicial discipline thus protects the public by fostering public confidence in the integrity of a self-policing judicial system.

Despite the above-quoted language from *Judge II* indicating that punishment is not "the purpose of judicial discipline," [26] we recognize, of course, that imposing sanctions on an offending judge has punitive effects. But while punishment plays an undeniable role in judicial discipline, punishment itself is not a goal of the process. The punitive aspect of judicial discipline serves multiple purposes: it discourages further misconduct on the part of the disciplined judge and the judiciary as a whole; it reinforces the general perception that judicial ethics are important; and it promotes public confidence by demonstrating that the judicial system takes misconduct seriously. Punishment thus subserves the various goals of judicial discipline, but is a means, not an end. We therefore reject Judge Johnstone's contention that public education and protection are not primary goals of judicial discipline in Alaska.

In summary, we are persuaded to apply the plain language of Alaska's judicial discipline statutes, which authorizes the commission to retain jurisdiction over a retired judge whose alleged misconduct occurs during a period of active judicial service and who remained an active judge when the commission began its investigation, provided that the investigation began within six years of the alleged misconduct. The legislative history of these statutes, the weight of authority from other jurisdictions, and important policy concerns all support this conclusion.

Because in this case the alleged misconduct occurred and the investigation commenced during Judge Johnstone's active judicial service, the commission's jurisdiction over the judge is clear.[27]

### C. Judge Johnstone's Actions Created an Appearance of Impropriety.

#### 1. Standard of review

■■■ The Alaska Supreme Court has the final authority in proceedings related to judicial conduct in Alaska.[28] We conduct a de novo review of both misconduct charges and the recommended sanction.[29] The fact of judicial misconduct must be established by clear and convincing evidence.[30] Clear and convincing evidence is "that amount of evidence which produces ... a firm belief or conviction about the existence of a fact to be proved." [31] Although our final authority over judicial conduct proceedings requires us to conduct an independent evaluation of the evidence,[32] we give some weight to the commission's factual determinations involving wit-

---

**24.** *See id.* (citations omitted) (emphasis added); *see also In re Robson,* 500 P.2d 657, 661 (Alaska 1972), *disapproved on other grounds, Judge II,* 788 P.2d 716.

**25.** *See, e.g., In re Probert,* 411 Mich. 210, 308 N.W.2d 773, 776 (1981) (citation omitted); *see also In re Kneifl,* 217 Neb. 472, 351 N.W.2d 693, 700 (1984); *In re Eastburn,* 121 N.M. 531, 914 P.2d 1028, 1035 (1996).

**26.** *Judge II,* 788 P.2d at 722.

**27.** Our conclusion that jurisdiction is clearly established and retained when, as here, a judge remains in active service at the inception of the commission's investigation makes it unnecessary for us to decide the broader issue of whether the

commission could assert jurisdiction when a judge retires before the commission receives a complaint or opens an investigation.

**28.** *See Inquiry Concerning a Judge* [*Judge III* ], 822 P.2d 1333, 1339 (Alaska 1991).

**29.** *See id.* at 1339, 1344.

**30.** *See In re Hanson,* 532 P.2d 303, 307–08 (Alaska 1975).

**31.** *Buster v. Gale,* 866 P.2d 837, 844 (Alaska 1994).

**32.** *See Judge III,* 822 P.2d at 1339.

ness credibility, since the commission is able to hear witnesses testify and can evaluate their demeanor.[33]

 2. *The facts surrounding McVeigh's hire, perceived cumulatively by an objectively reasonable person, create an appearance of impropriety.*

The commission concluded that the special counsel did not establish by clear and convincing evidence that Judge Johnstone had actually acted improperly. But the commission found that the evidence established that Judge Johnstone's actions did create an appearance of impropriety. Specifically, the commission found:

> [Judge Johnstone] was not legally obligated to use a merit selection process to fill the Coroner/Public Administrator position. But [Judge Johnstone] invoked a process by which the public was informed of the qualifications for the position, applications were solicited, and a process for review and evaluation of the applicants was followed. [Judge Johnstone] could not then go outside that process and appoint an individual:
>
> -who had not applied during the application period;
>
> -whose name was suggested by the Chief Justice;
>
> -whom respondent knew to be a personal friend of the Chief Justice;
>
> -purportedly, on the basis of criteria (legal training and experience) that were not part of the position's stated qualifications; and
>
> -on terms (temporary basis) that were significantly different from those advertised to the general public,

without creating an unmistakable appearance that something improper was afoot.

■ To evaluate whether Judge Johnstone's conduct created an appearance of impropriety, the commission relied on the objectively reasonable person test set forth in our cases.[34] Under this test, the commission must evaluate whether the judge failed "to use reasonable care to prevent objectively reasonable persons from believing an impropriety was afoot." [35]

Judge Johnstone challenges the commission's application of this test, arguing that the commission arbitrarily assumed that the reasonably objective person would be aware of certain facts but not others. Specifically, the judge argues that he did not actually know, nor would the objectively reasonable person have known, that "McVeigh 'was poorly rated by those charged with selection of the best candidate.' " Likewise, Judge Johnstone complains, the commission improperly assumed that an unwritten court system custom or practice limited him in appointing a candidate whose application had not been received within the merit recruitment process.

■ Having reviewed the commission's decision, however, we conclude that the commission applied the objectively reasonable person test correctly to the evidence before it.[36] Its findings give Judge Johnstone the benefit of the doubt with respect to all of the facts that he disputes. The specific facts that the commission relied on to find an appearance of impropriety did not include details concerning McVeigh's interview or the screening committee's impressions of his qualifications. And the commission expressly stated that its conclusion "is not predicated on a determination that respon-

---

**33.** *See Kennick v. Commission on Judicial Performance,* 50 Cal.3d 297, 267 Cal.Rptr. 293, 787 P.2d 591, 598 (1990).

**34.** *See Judge III,* 822 P.2d at 1340; *Judge II,* 788 P.2d 716, 723 (Alaska 1990).

**35.** *Judge III,* 822 P.2d at 1340 (quoting *Judge II,* 788 P.2d at 723).

**36.** This court has at various times described the objectively reasonable person test in slightly different ways. *Compare Judge III,* 822 P.2d at 1340–43 (describing and applying the objectively reasonable person test) *with Judge III,* 822 P.2d at 1349–53 (Schulz and Tunley, J.J., concurring in part and dissenting in part) (criticizing formulation and application of the objectively reasonable person test). We decline Judge Johnstone's invitation to decide which specific form of the objectively reasonable person test governs his case. In our view the differences in these formulations are more semantic than real and create no substantive ambiguity.

dent's actions violated a court system practice or policy." Essentially, the commission decided that, even when all of the facts are viewed in Judge Johnstone's favor, the totality of the circumstances surrounding his decision to hire McVeigh create an "unmistakable appearance that something improper was afoot."

Even assuming that the commission reached this decision by improperly applying the objectively reasonable person standard, the error would be inconsequential. For we apply the same standard anew when we independently review the record and decide whether to follow the commission's recommendation. As we explain below, our own application of this standard leads us to agree with the commission.

The circumstances of this case strongly suggest that Judge Johnstone settled on McVeigh as his candidate of choice early on—contemporaneously with or shortly after Chief Justice Moore suggested McVeigh as a candidate for the coroner's position. Judge Johnstone's first contact with McVeigh left the impression that the job was his for the taking: McVeigh testified at the commission hearing that he inferred from Judge Johnstone's initial telephone contact around December 15 that he had a good chance of getting the job. Yet at that time Judge Johnstone knew little about McVeigh's specific qualifications, and McVeigh had not even applied for the position.

On December 19 the screening committee interviewed McVeigh at Judge Johnstone's insistence, even though the application deadline had already passed, all qualified applicants had already been interviewed and ranked, and McVeigh had only submitted an informal application—a letter and a resume rather than the standard court system application form. In the following days—despite being told by Szal that the screening committee had ranked McVeigh only sixth out of ten interviewed applicants, and without inquiring about the reasons for this low ranking—Judge Johnstone announced that he intended to hire McVeigh, directing Szal to notify the

original applicants that the original merit process would be "closed out" without selection of an applicant.

Although Judge Johnstone insists that he decided to hire McVeigh based on his legal training and experience, there were other candidates in the initial applicant pool who had this training. Moreover, the rejection letters sent to the interviewed applicants on December 20 represented that a candidate would be chosen from a "subsequent selection process." Yet there would be no subsequent process: by the time Judge Johnstone sent the letter he had already decided to hire McVeigh. Thereafter, to accommodate McVeigh's desire to retain his current retirement benefits, the judge—acting against the deputy court administrative director's explicit advice—took the unusual step of hiring McVeigh as a temporary appointee to the traditionally permanent coroner's position.

It is undisputed that because the coroner position was partially exempt, Judge Johnstone initially had no duty to follow a merit selection process. But once a merit process was underway, it should have been obvious to Judge Johnstone that he could not select an individual from outside that process without upsetting the reasonable expectations of the many individuals who had relied on the original employment bulletin and had followed established procedures. Moreover, Judge Johnstone should reasonably have known that special precautions would be required to avoid the appearance of impropriety because McVeigh was a close friend of Chief Justice Moore and had been recommended by the chief justice on a last-minute basis. Even if the thought did not initially occur to Judge Johnstone, Stephanie Cole's strongly worded advice expressly warned him of the danger of perceived impropriety.

The question presented is not whether Judge Johnstone's individual actions viewed in isolation would give rise to an appearance of impropriety. Rather, the cumulative effect of these actions is at issue.[37] Our independent review of the record convinces us that, in their totality, the events of this case

---

37. *See Judge III*, 822 P.2d at 1347 (Hodges, J., concurring and dissenting) ("In isolation, the [conduct complained of] is not improper, but when viewed in context—which you must do—it is!").

give rise to an overwhelming appearance of impropriety; they would leave an objectively reasonable person with the indelible impression that McVeigh's hiring involved favoritism.

By a vote of three to five, the commission declined to find clear and convincing evidence of actual impropriety. Giving appropriate deference to the commission's superior abilities in determining the credibility of the witnesses who appeared before it, we do not question the actual propriety of Judge Johnstone's actions. But the commission unanimously found clear and convincing evidence that Judge Johnstone's conduct created an appearance of favoritism. Judge Johnstone's explanation for his decision to hire McVeigh—that he thought McVeigh was the most qualified applicant—may shed light on his after-the-fact, subjective belief. But this explanation does nothing to eliminate the appearance arising from the objective record: that Judge Johnstone chose McVeigh over other candidates for reasons unrelated to McVeigh's qualifications. This is the essence of an appearance of favoritism and, consequently, the appearance of impropriety.[38]

We acknowledge that the appearance of impropriety standard can raise special problems in the arena of judicial discipline. In some situations, a judge may be duty-bound to take actions or make rulings that will predictably stir public controversy. In such cases, duty certainly must prevail over appearance: when duty requires a judge to take controversial action, it would be logically untenable and morally repugnant to suggest that the judge should be sanctioned merely because the action raises a public clamor.

But our case law applying the appearance of impropriety standard resolves this dilemma. As the commission observed, quoting from this court's decision in *Inquiry Concerning a Judge* [*Judge III* ]: "A judge has a duty under Canon 2 to '*use reasonable care* to prevent objectively reasonable persons from believing an impropriety [is] afoot.' " [39] And in concluding that Judge Johnstone's conduct created an impermissible appearance of impropriety, the commission went out of its way to find that "there were alternatives available that would have eliminated or substantially reduced the appearance problem here."

In recognizing that an appearance of impropriety is sanctionable only when the appearance could have been avoided by reasonable care, and in expressly finding that Judge Johnstone could readily have avoided the appearance of impropriety that he created in this case, the commission correctly applied *Judge III*.

### D. Sanction

▮▮ In reviewing a recommendation for judicial sanctions, we follow by analogy the ABA Standards for Imposing Lawyer Sanctions.[40] The analysis requires us to consider four primary elements: the ethical duty violated, the extent of actual or potential injury, the judge's mental state, and the presence of aggravating or mitigating factors.[41]

▮▮ Here, the appearance of impropriety arising from Judge Johnstone's conduct

---

38. In light of this conclusion, we see no need to attempt a comprehensive definition of "appearance of impropriety." At a minimum, an improper appearance could be found where a thorough investigation of all available information would leave an intelligent and reasonably informed member of the public with an undispelled suspicion of actual impropriety. But the notion of undispelled suspicion is not definitive. Because conduct that necessitates a full-scale inquiry to allay public suspicion itself suggests impropriety, an impermissible appearance also might be found—regardless of whether an investigation eventually dispelled suspicion of actual misconduct—if readily avoidable conduct foreseeably caused reasonably intelligent and informed members of the public to demand a full inquiry into suspected impropriety. Ultimately, what qualifies as an appearance of impropriety may defy precise definition. But this case requires no such precision, for our acceptance of the commission's finding of an "unmistakable appearance that something improper was afoot" necessarily establishes that Judge Johnstone's conduct falls far closer to the core of the prohibition than to its borderline.

39. *Judge III*, 822 P.2d at 1340 (emphasis added).

40. *See Judge II*, 788 P.2d at 723.

41. *See id.* at 724; *see also Disciplinary Matter Involving Buckalew*, 731 P.2d 48, 51–52 (Alaska 1986) (quoting ABA Standards, Theoretical Framework, ABA/BNA at 01:805–06).

caused harm that is both actual and significant. An appearance of favoritism will always impair the general public's confidence in the judiciary. But here the appearance also caused direct and immediate damage to the large group of applicants who invested considerable time and effort in applying for the coroner's position by following the announced recruitment process and who had every right to expect fair treatment in return for their efforts.

With respect to intent, Judge Johnstone's conduct was negligent at best. The surrounding circumstances should reasonably have alerted the judge that his actions would be perceived as improper. And at worst, given that the judge was repeatedly advised of the undesirable appearance that his actions would create, his mental state could be classified as recklessness or actual knowledge.[42]

Even though we recognize—and indeed emphasize—that we have found no actual impropriety on the part of Judge Johnstone, we conclude that a public reprimand is appropriate in light of the substantial harm caused by the appearance of impropriety that he created and the compelling need to foster public confidence in our judicial system's ability to protect against favoritism.

## III. CONCLUSION

We AFFIRM the commission's jurisdictional ruling and its finding that Judge Johnstone created an appearance of impropriety in his appointment of Richard McVeigh. We also accept its recommendation for discipline. Accordingly, Judge Johnstone will be issued a public reprimand.

MATTHEWS, Chief Justice, and EASTAUGH, FABE, and CARPENETI, Justices, not participating.

### Order

Upon consideration of Petitioner's motion to treat this court's opinion as the public reprimand and the Commission's response stating that it takes no position on Petitioner's motion,

IT IS ORDERED:

Petitioner's motion is GRANTED. The publication of this court's opinion in *In re Karl S. Johnstone*, S–8387, constitutes Petitioner's public reprimand.

Entered at the direction of the court.

---

**42.** Neither party has argued that any aggravating or mitigating factors would apply to this case.