NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of<br><br>A.S. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Supreme Court No. S-17579

Superior Court No. 3AN-19-01664 PR

<u>MEMORANDUM OPINION<br>AND JUDGMENT</u>[*]

No. 1838 – July 21, 2021

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Una S. Gandbhir, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for A.S. Katherine Demarest, Assistant Attorney General, Anchorage, and Clyde "Ed" Sniffen, Acting Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

## I.    INTRODUCTION

The respondent in a civil commitment matter appeals the superior court's order authorizing a 30-day commitment for mental health treatment, arguing that the evidence presented at the hearing did not establish the necessary statutory elements for the involuntary commitment. We affirm the superior court's order.

---

[*]    Entered under Alaska Appellate Rule 214.

## II. FACTS AND PROCEEDINGS

A.S.[1] has a history of schizophrenia diagnoses and treatment.[2] On July 31, 2019, a police officer transported A.S. to a hospital emergency department where staff documented a report that A.S.'s mother had called the police. According to the report, she had said that A.S. believed her to be a doppelganger, that he had threatened to kill her, and that she feared for her life and the safety of children in the home. Hospital staff petitioned the superior court to order that A.S. be hospitalized for a mental health evaluation,[3] noting in the petition that A.S. had not been taking his medication at the time and that he believed his mother to be part of Satan's army. The court issued the requested order.[4]

Alaska Psychiatric Institute (API) admitted A.S. on August 6, and psychiatrist Dr. Craig Kaiser evaluated A.S.; Dr. Kaiser diagnosed A.S. with schizophrenia. On August 8 API staff, including Dr. Kaiser, petitioned for A.S.'s

---

[1] A.S. requested that rather than a pseudonym we use his initials to protect his privacy.

[2] *Schizophrenia*, STEDMAN'S MEDICAL DICTIONARY (2014) ("[D]enoting a common type of psychosis, characterized by abnormalities in perception, content of thought, and thought processes (hallucinations and delusions) and by extensive withdrawal of interest from other people and the outside world, with excessive focusing on one's own mental life.").

[3] *See* AS 47.30.700 (permitting any adult to petition for ex parte order for mental health evaluation if individual is "reasonably believed to present a likelihood of serious harm to self or others or is gravely disabled as a result of mental illness" and requiring court to conduct or order screening investigation upon receiving petition).

[4] *See id.* (permitting court to grant ex parte order for hospitalization for mental health evaluation upon showing of probable cause that "respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others"); AS 47.30.715 (providing for 72-hour evaluation period).

involuntary 30-day commitment for treatment,[5] alleging that A.S. was mentally ill and likely to cause serious harm to others.[6]

At an August 9 commitment hearing Dr. Kaiser was the sole witness. The magistrate judge qualified Dr. Kaiser as an expert in psychiatry without objection. Dr. Kaiser testified that he diagnosed A.S. as having schizophrenia, that A.S. had "consistently" been diagnosed with psychosis, and that, in Dr. Kaiser's opinion, A.S. was likely to cause harm to others if not committed for treatment. Dr. Kaiser's testimony and the relevant evidentiary objections to it are detailed below in our discussion of A.S.'s argument that the evidence presented did not meet statutory requirements for commitment.

The magistrate judge found by clear and convincing evidence, based on Dr. Kaiser's expert testimony, that A.S. was mentally ill and likely to cause serious harm to others.[7] The magistrate judge recommended that the superior court order the 30-day commitment. A.S. filed objections to the magistrate judge's recommendation, arguing

---

[5] *See* AS 47.30.730 (providing that 30-day involuntary commitment petition may be filed during evaluation period and establishing petition requirements).

[6] *See* AS 47.30.730(a)(1) (requiring 30-day commitment petition include allegation that "respondent is mentally ill and as a result is likely to cause harm to self or others or is gravely disabled"); *see also E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1110 (Alaska 2009) (applying statutory definition of AS 47.30.915's "likely to cause serious harm" to AS 47.30.730's undefined "likely to cause harm").

[7] *See* AS 47.30.735(c) (requiring proof by clear and convincing evidence before committing individual to treatment facility for up to 30 days). Involuntarily committing a respondent for mental disorder treatment represents severe curtailment of a significant liberty interest and thus requires a high "clear and convincing" evidentiary standard. *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1193 (Alaska 2013). "The 'clear and convincing' standard of proof required by the [involuntary commitment] statute demands 'a firm belief or conviction about the existence of a fact to be proved.'" *Id.* at 1192-93 (quoting *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000)).

that the State had failed to demonstrate by clear and convincing evidence that he had engaged in "recent behavior causing, attempting, or threatening harm" to others as required by statute for commitment.[8] The superior court reviewed the commitment hearing de novo[9] and ordered the 30-day commitment for treatment.

A.S. appeals.[10]

## III.   STANDARD OF REVIEW

" 'Factual findings in involuntary commitment . . . proceedings are reviewed for clear error,' and we reverse those findings only if we have a 'definite and firm conviction that a mistake has been made.' "[11] " '[W]hether factual findings comport

---

[8]   *See* AS 47.30.915(12) (defining "likely to cause serious harm" to include "substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and . . . likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person").

[9]   Alaska Civil Rule 53(d)(2)(B) requires the superior court to "consider under a de novo standard of review all objections to findings of fact made or recommended in the [magistrate judge's] report."

[10]   Appeal of an order authorizing detention and hospitalization for psychiatric purposes generally is subject to the public interest exception to the mootness doctrine, whether the appeal challenges a question of statutory or constitutional interpretation or is evidence-based. *In re Hospitalization of Naomi B.*, 435 P.3d 918, 930 n.60 (Alaska 2019) ("[R]egardless of the type of involuntary admission or medication proceeding being challenged or the legal basis for appeal, the public interest exception authorizes us to consider any such appeal on the merits.").

[11]   *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007), *overruled on other grounds by In re Naomi B.*, 435 P.3d at 936).

with the requirements of [the involuntary commitment statute],' is a question of law that we review de novo."[12]

## IV. DISCUSSION

### A. Legal Framework

"[M]ental illness alone is insufficient to form a constitutionally adequate basis for involuntary commitment."[13] Alaska Statute 47.30.735(c) states that "the court may commit the respondent to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to . . . others." Even though AS 47.30.735's "likely to cause harm" language is not identical to "likely to cause serious harm" defined in AS 47.30.915, we have previously considered the defined phrase relevant to interpreting the commitment language.[14] "The respondent is 'likely to cause serious harm' if the respondent 'poses a substantial risk of harm to others as manifested by recent behavior causing, attempting, or threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person.' "[15]

### B. A.S.'s Argument

The thrust of A.S.'s argument is that no admissible or non-speculative evidence in the record supports a determination that he had manifested "recent behavior

---

[12] *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262 (Alaska 2019) (quoting *Wetherhorn*, 156 P.3d at 375); *see also In re Naomi B.*, 435 P.3d at 923-24.

[13] *Wetherhorn*, 156 P.3d at 376; *see also In re Naomi B.*, 435 P.3d at 931 ("[C]onstitutional rights 'extend equally to mentally ill persons so that the mentally ill are not treated as persons of lesser status or dignity because of their illness.' " (quoting *Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006))).

[14] *E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1110 (Alaska 2009).

[15] *In re Jacob S.*, 384 P.3d at 765 (quoting AS 47.30.915(12)(B)).

causing, attempting, or threatening harm" as the statutory definition of "likely to cause serious harm" requires. A.S. thus concludes that the State did not prove by clear and convincing evidence that he was likely to cause harm to someone.

## C. Dr. Kaiser's Testimony

At the August 9 involuntary commitment hearing Dr. Kaiser testified:

Q    When -- or how are you familiar with [A.S.]?

A    I did his admission paperwork when he was admitted to the hospital, API, under ex parte and did his psychiatric evaluation.

Q    And when did the patient arrive at API?

A    Tuesday [August 6].

Q    Are you [A.S.'s] treating psychiatrist?

A    Yes.

. . . .

Q    And have you had the opportunity to evaluate and diagnose the patient?

A    Yes.

Q    And what is your current diagnosis?

A    Schizophrenia.

. . . .

Q    And have you looked at any other information in coming to this diagnosis?

A    Yeah, his past admission in February, 2019, his emergency department reports from July 31st, and that's it.

Q    And does this patient have any other diagnosis or a history of any diagnoses?

A    Well, he's been diagnosed with psychosis consistently.

Q     And in your opinion, does the patient pose a risk of harm to himself or others?

A     To others, yes.

Q     And why is that?

A     He's threatened to kill his mother and alluded to harming his mother's boyfriend, and that's documented by myself and also documented in the emergency department after the police department brought him in for evaluation, after his mother called the police and reported him having threatened her.

Q     And is this a -- do you believe this is a viable threat?

A     Yes.

Q     And why do you believe that?

A     Because he's not thinking linearly and logically, and he's currently in a psychotic state.  In his psychotic state, he's more than likely to do something not based in reality.

Q     And what symptoms is the patient showing that lead you to believe he's in a psychotic state?

A     He's not organized and linear in his thought, and he's having delusional thoughts in regards to his mother not being his mother.  He says she's a doppleganger and that she's part of Satan's army -- the doppleganger is.  When he first met me, he thought I sold him a house several months ago.  He said I'm a doppleganger, that I'm not really a psychiatrist, I'm a realtor or someone that sold him the house.  He's made comments to me about my German heritage, just very loose and tangential.  He made comments about his mother needing to die, or his mother's doppleganger because she's part of Satan, those type of things.

. . . .

-7-                                           *1838*

> Q     [H]ow are you familiar with the information about his mother?
>
> A     It was given in a police report. It's documented in the emergency department report on July 31, 2019.

At this point A.S.'s attorney objected, on hearsay grounds, to Dr. Kaiser's testimony about the police report to the extent that it might have been offered for the truth of the allegations that A.S. had threatened his mother.[16] The State's attorney clarified that the testimony was offered to show how and what Dr. Kaiser knew before evaluating A.S.[17] The court said the testimony about the police report was not offered to prove the truth of the matters in the report, and the evidentiary objection was withdrawn. Dr. Kaiser continued his testimony:

> Q     And what led to the patient's admittance here at API?
>
> A     His mother called the police after he threatened to kill her.

A.S.'s attorney again objected to the testimony on hearsay grounds. After discussion, the court said: "I don't think that it's being offered to prove that [A.S.] actually threatened to kill his mother. The doctor is reporting what he read in regular reports which are regularly admitted. So you can do that." Dr. Kaiser's testimony continued:

---

[16] *See* Alaska R. Evid. 801(c) ("Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); Alaska R. Evid. 802 ("Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Alaska Supreme Court, or by enactment of the Alaska Legislature.").

[17] *See* Alaska R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Facts or data need not be admissible in evidence, but must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.").

Q Has the patient been aggressive towards anyone while at API?

A He's been verbally aggressive on the unit to other patients, but there's been no physical contact.

. . . .

Q Has the patient made other threats of harm while at API?

A Not at this point in time.

Q And has the patient --

A He -- he talked about in session with me yesterday about his mother not being his mother and she needed to -- that she was Satan's army but it was not a direct threat to kill her.

. . . .

Q And what are the risks if the patient is discharged and not treated?

A I think he has a high propensity for violence in his current delusional state. And I think he could potentially hurt other people.

A.S.'s attorney then cross-examined Dr. Kaiser:

Q So, Dr. Kaiser, [A.S.] presented at the ER . . . on July 31?

A Yes, ma'am.

Q Then he waited until he arrived here on August 6. In the documentation from the ER is that there was a report of potential harm with his mother on the -- July 31, right?

A Correct.

Q There's no documentation after that that he made an additional threat?

A       Correct.

A.S.'s attorney did not request any limitation on the admissibility of Dr. Kaiser's responses to the foregoing questions. The cross-examination continued:

Q       Okay . . . . the notes throughout his time here have been that while he hasn't been engaging in outbursts or anything like that, right?

A       He's -- that report in the document, he's walking the halls pacing. He's agitated. He's had confrontations -- verbal confrontations with some other patients. They've separated them because they (indiscernible - telephonic) going to come to a physical attack if we'd not done anything. And after a period of time (indiscernible - telephonic) be redirected.

Q       Were you present for those confrontations?

        . . . .

A       No, it's been (indiscernible - simultaneous speech).

Q       Okay, and --

A       I've been present with watching him and monitoring him pacing in the hall.

Q       Sure.

A       And responding to internal stimuli when no one's around and talking.

Q       Okay.

A       But . . . I have not seen him interacting with other patients and getting in physical or verbal confrontations --

Q       Okay.

A       -- documented by staff.

Q       And other patients here may be experiencing [acute] psychosis, right?

A     Correct.

Q     They might also be initiating confrontations?

A     Correct.

A.S.'s attorney did not request any limitation on the admissibility of this testimony.

## D.    Why We Affirm The Superior Court's Decision

An expert witness is permitted to rely on material not in evidence to form an opinion, as long as the material is typically relied on by experts in that particular field.[18] A court may rely on such expert witness opinion in a commitment hearing:

> Because he testified as an expert, the psychiatrist was entitled to rely on "facts or data . . . not . . . admissible in evidence" as long as they were "of a type reasonably relied upon by experts in [his] particular field," and "disclose . . . the underlying facts or data" supporting his opinion. It was not error for the court to rely on the expert testimony based on such information.[19]

A.S.'s attorney did not object to Dr. Kaiser's qualification as an expert witness or to Dr. Kaiser's reliance on otherwise inadmissible evidence to support his expert opinion. When objecting to Dr. Kaiser's direct examination testimony that included hearsay about the alleged threat to A.S.'s mother, A.S.'s attorney said that Dr.

---

[18]    *See id.*

[19]    *In re Hospitalization of Rabi R.*, 468 P.3d 721, 732 (Alaska 2020) (alternations in original) (citation omitted) (first quoting Alaska R. Evid. 703; then quoting Alaska R. Evid. 705); *see also Pingree v. Cossette*, 424 P.3d 371, 378 (Alaska 2018) ("[E]xpert[s] . . . do not have to rely only on admissible evidence in forming their opinion, and evidence they rely on may be disclosed during [their] testimony.").

Kaiser "can certainly review and rely on hearsay in forming his opinions, but it can't be admitted for its truth." The court correctly agreed.[20]

Yet during Dr. Kaiser's later cross-examination, A.S.'s attorney asked Dr. Kaiser to confirm that in the hospital emergency room documentation "there was a report of potential harm with his mother on . . . July 31st." Dr. Kaiser confirmed it. This was a different questioning formulation than the earlier questions about A.S.'s alleged threat to kill his mother, and A.S.'s attorney did not seek to limit the admissibility of the testimony. Without needing to parse Dr. Kaiser's earlier objected-to testimony for a distinction about truth and timing of the alleged harm, this testimony demonstrates that during the August 6 evaluation and while giving the August 9 testimony, Dr. Kaiser was considering A.S.'s recent conduct that had begun on July 31. This is further established by Dr. Kaiser's testimony about API documenting A.S.'s verbal confrontations with other patients since August 6 and about API staff stepping in to prevent "a physical attack" involving A.S. No objections or requests for limitation were made to this testimony.

The superior court relied on Dr. Kaiser's testimony about A.S.'s recent conduct at API and on Dr. Kaiser's expert opinion that absent treatment at API A.S. was likely to cause harm to others. A.S. contends that there is not clear and convincing evidence of recent conduct supporting a finding that he was likely to cause harm to others, primarily because Dr. Kaiser had not witnessed the conduct documented by API staff and he had conceded that other patients may have initiated the confrontations.

A.S. did not object to and does not contest the admissibility of Dr. Kaiser's testimony about A.S.'s recent conduct at API. A.S. did not seek to limit Dr. Kaiser's

---

[20]    *See* Alaska R. Evid. 802 (regarding general inadmissibility of hearsay evidence); Alaska R. Evid. 105 (authorizing court, when evidence is admissible for some purposes but not for others, to "restrict the evidence to its proper scope").

testimony about API's records of staff encounters with A.S., like he did with respect to Dr. Kaiser's testimony about the July 31 incident.[21] And Dr. Kaiser, in forming his expert opinion, was entitled to rely on API records of staff encounters with A.S.[22]

Dr. Kaiser presented admissible evidence about A.S.'s recent conduct at API, and Dr. Kaiser's expert opinion testimony, deemed credible, supports the finding of likely future harm to others.[23] We do not have a definite and firm conviction that the superior court erred by making the necessary factual finding by clear and convincing evidence.

## V.    CONCLUSION

We AFFIRM the superior court's involuntary commitment order.

---

[21]    We note that API's records of staff encounters with A.S. likely would have been admissible notwithstanding a hearsay objection. *See* Alaska R. Evid. 803(6) (setting out business records exception to hearsay rule).

[22]    *See* Alaska R. Evid. 703 (setting out "facts or data" expert may rely on in forming opinion).

[23]    *See In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1263 (Alaska 2019) ("A respondent is 'likely to cause harm' if the respondent 'poses a substantial risk of harm to others as manifested by recent behavior . . . threatening harm, and is likely in the near future to cause physical injury, physical abuse, or substantial property damage to another person.' " (quoting AS 47.30.915(12)(B))).